Rita Lynn **BAKER**, Plaintiff,

v.

**JOHN MORRELL & CO.**, Defendant.

No. C01–4003–MWB.

United States District Court,
N.D. Iowa,
Western Division.

March 17, 2003.

Stanley E. Munger, Jay Elliot Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Melanie L. Carpenter, Gary P. Thimsen, Woods, Fuller, Shultz & Smith, PC, Scott C. Folkers, Scott Folkers Law, Sioux Falls, SD, Leslie R. Stellman, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION TO AMEND JUDGMENT AND PLAINTIFF'S MOTION TO AMEND COMPLAINT**

BENNETT, Chief Judge.

**TABLE OF CONTENTS**

I. **INTRODUCTION AND BACKGROUND** .....................................1147

II. **DISCUSSION** .........................................................1149
 A. *Defendant's Motion for Judgment as a Matter of Law* ....................1149
 1. *Applicable standards* ...........................................1149
 2. *Sufficiency of the evidence—sexual harassment*......................1151
 a. *Based on sex* ...........................................1152
 b. *Severe or pervasive*.....................................1155
 c. *Proper remedial action* .................................1161
 d. *Summary*................................................1163
 3. *Sufficiency of the evidence—retaliation* ..........................1164
 a. *Increased job duties, refusal to assist, denial of breaks* ...........1165
 i. *Adverse employment actions?* ...........................1165
 ii. *Causal connection* ...................................1168
 b. *Allowing the harassment to continue* .....................1169
 4. *Sufficiency of the evidence—constructive discharge* ..................1170
 a. *Intolerableness of working conditions* ....................1171
 b. *Intentionally made working conditions intolerable* ..............1174
 B. *Defendant's Motion for New Trial* ...............................1177
 1. *Applicable standards* ...........................................1177
 2. *Was the testimony of other John Morrell female employees so unfairly prejudicial that a new trial is warranted?*.................1177
 3. *Specific allegations of harassment in jury instructions* .............1180
 4. *Admission of rumor evidence* ....................................1181
 5. *Admission of Dr. Jennings's testimony* ...........................1182
 6. *Statements made during plaintiff's closing argument*.................1183
 C. *Plaintiff's Motion to Amend Complaint* .............................1184
 D. *Defendant's Motion to Amend the Judgment* .........................1190
 1. *Application of the statutory damages cap*..........................1191
 2. *Sufficiency of the evidence to support compensatory damages award*........................................................1192
 3. *Summary of Damages* ...........................................1194

III. **CONCLUSION** .......................................................1194

Title VII "is ... neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace."[1] The defendant in this sex discrimination case argued that this was precisely what the plaintiff was attempting to do. The jury rejected that contention, and following an exceptionally well-tried employment discrimination jury trial, the court is called upon in these post-trial motions to answer, among other things, whether the plaintiff presented sufficient evidence on her Title VII claims to support the jury's verdict in her favor. Specifically, the court will resolve the defendant's motions for judgment as a matter of law, for new trial, and to amend judgment. The court must also resolve the plaintiff's motion to amend complaint.[2]

## I. INTRODUCTION AND BACKGROUND

This sex discrimination lawsuit arose out of Rita Baker's ("Baker") employment with the defendant, John Morrell & Co. ("John Morrell"), as a Computer Scale Op-

**1.** *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001) (internal quotations omitted) (citation omitted).

**2.** The plaintiff also filed a Motion to Amend Judgment in which she seeks an award of front pay, as well as a Motion for Attorney's Fees, Expenses, and Costs. Because of an inadequate record, the court will dispose of these motions separately, pending an evidentiary hearing.

erator in the defendant's Sioux City, Iowa meat packaging plant. Baker began her employment at John Morrell in 1984, and she continued to work for John Morrell until April of 2001. She initiated this lawsuit, claiming that she was constructively discharged, subjected to disparate treatment and a sexually hostile work environment, and retaliated against for challenging the sexual discrimination she endured at John Morrell—all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

The case was tried to a jury for seven days, beginning on September 23, 2002. The case was submitted to the jury in the late afternoon of October 1, 2002. The following afternoon, on October 2, 2002, the jury returned its verdict. It found in favor of Baker on her claims of sexual harassment and retaliation. The jury also found on both of these claims that Baker was constructively discharged, and, pertinent to her retaliation claim, the jury found that John Morrell had failed to prove its "same decision" defense. On Baker's claim of disparate treatment, the jury found in favor of John Morrell.

The jury awarded the following damages for John Morrell's wrongful conduct: On her claim of sexual harassment, $250,000.00 for past emotional distress and $50,000.00 for future emotional distress; on her retaliation claim, $75,000.00 for past emotional distress and $10,000.00 for future emotional distress. The jury also awarded $150,000.00 for past emotional distress and $200,000.00 for future emotional distress for Baker's constructive discharge. Moreover, the jury awarded $14,470.24 for Baker's past medical expenses and $90,000.00 for future medical expenses on her sexual harassment claim. The jury also found that Baker was entitled to a $33,314.73 award for backpay. Finally, the jury assessed a sizable punitive damages award against John Morrell: $600,000.00 for sexual harassment and $50,000.00 for retaliation. The Clerk of Court entered this judgment on October 2, 2002.[3]

The plaintiff in this case is represented by lead counsel Stanley Munger, as well as by Jay Denne and Colby Lessman, all of Munger, Reinschmidt & Denne, Sioux City, Iowa. The defendant is represented by Leslie Stellman of Hodes, Ulman, Pessin & Katz, P.A., Towson, Maryland, and by Scott Folkers, in-house counsel for John Morrell in Sioux Falls, South Dakota.

Presently before the court is the plaintiff's Motion to Amend Complaint (Doc. No. 120). The defendant has also filed several post-trial motions, which are before the court as well: Motion for Judgment as a Matter of Law (Doc. No. 131); Motion for New Trial (Doc. No. 133); and Motion to Amend Judgment (Doc. No. 135). Both parties filed timely resistances to the opposing party's various post-trial motions, and the court finds that the case is ripe for disposition.

The basis of John Morrell's Motion for Judgment as a Matter of Law, brought pursuant to Federal Rule of Civil Procedure 50, is threefold. First, John Morrell argues that the plaintiff produced insufficient evidence at trial for a reasonable jury to find in favor of the plaintiff on her sexual harassment claim because the evidence failed to show (1) that the harassment was "based on sex"; (2) that the harassment was sufficiently severe or pervasive to have affected a term, condition, or privilege of Baker's employment; or (3) that John Morrell did not take proper remedial action. Second, the defendant contends that there was no legally sufficient basis for a reasonable jury to find for Baker on her retaliation claim, primarily

---

**3.** The sum of Baker's jury award totals $1,522,784.97.

because John Morrell asserts that her claim fails for lack of causation. And third, John Morrell argues that it is entitled to judgment as a matter of law because there was no legally sufficient basis for a reasonable jury to find for the plaintiff on her claims of constructive discharge because Baker's working conditions at John Morrell were not objectively intolerable and because the evidence did not demonstrate that John Morrell intentionally made Baker's working conditions intolerable in an effort to force her to quit.

In the defendant's Motion for New Trial, brought pursuant to Federal Rule of Civil Procedure 59, John Morrell submits that it is entitled to a new trial because (1) the court erroneously allowed the unfairly prejudicial testimony of other current and former female John Morrell employees who testified that they had experienced sexual harassment at John Morrell; (2) the court improperly instructed the jury and prejudiced the defendant by including specific allegations of the alleged harassing conduct in Final Instruction No. 3, which outlined the elements of Baker's sexual harassment claim; (3) the court erroneously permitted hearsay rumor testimony; (4) the court erroneously allowed Baker's treating general physician to testify regarding the substance and causation of the plaintiff's emotional distress; and (5) in closing arguments, the plaintiff's counsel referred to the sexual harassment that Baker experienced as "terrorist" acts, which John Morrell argues was unwarranted and highly prejudicial to the defendant.

In John Morrell's last motion, its Motion to Amend Judgment, John Morrell argues that the court should reduce the plaintiff's substantial jury award to $300,000.00, exclusive of backpay, in order to comply with Title VII's statutory damages cap, as provided for by the Civil Rights Act of 1991, 42 U.S.C. § 1981a(b)(3)(D). Moreover, the defendant requests the court further remit Baker's emotional distress award on the grounds that the award is excessive and not supported by the evidence. John Morrell also contends that the jury's award for punitive damages must be stricken because Baker failed to prove that the defendant acted with the requisite "malice or reckless indifference" to her rights under Title VII. In the alternative, John Morrell requests that the punitive damages award be remitted, arguing that it is excessive and not supported by the evidence.

In the plaintiff's Motion to Amend Complaint, Baker seeks leave of court to amend her complaint to conform to the evidence, pursuant to Federal Rule of Civil Procedure 15, to add a claim under the Iowa Civil Rights Act ("ICRA"), Iowa Code chapter 216. The amendment is critical because only by adding a state-law claim on her sexual harassment and retaliation claims can she escape the Title VII damages liability cap. Baker argues that the defendant was on notice of the state-law claims and was not prejudiced in its defense of the lawsuit because the standards for liability are identical under Iowa law and federal law. In addition, the plaintiff seeks an award of prejudgment interest, which is available under state law but not under federal law.

## II. DISCUSSION

The court will begin its analysis by addressing the defendant's motions for judgment as a matter of law and for new trial, turning next to the plaintiff's motion to amend complaint, and concluding with a discussion of the myriad of issues related to the plaintiff's damages.

### A. Defendant's Motion for Judgment as a Matter of Law

#### 1. Applicable standards

The standards for a motion for judgment as a matter of law are outlined in Rule 50 of the Federal Rules of Civil Pro-

cedure. In pertinent part, Rule 50 provides:

(a) **Judgment as a Matter of Law.**

(1) If during the trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before the submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) **Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law; or

(2) if no verdict was returned;

(A) order a new trial, or

(B) direct entry of judgment as a matter of law.

FED R. CIV. P. 50(a)-(b).

■■■ "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Manus v. American Airlines, Inc.,* 314 F.3d 968, 972 (8th Cir.2003) (quoting *Belk v. City of Eldon,* 228 F.3d 872, 877–78 (8th Cir.2000) (citation omitted by *Manus* court)). The Eighth Circuit Court of Appeals reiterated the standards to be applied by the district court—as well as the appellate court—in determining a motion for judgment as a matter of law:

> When the motion seeks judgment on the ground of insufficiency of the evidence, the question is a legal one. *Hathaway v. Runyon,* 132 F.3d 1214, 1220 (8th Cir.1997); *Jarvis v. Sauer Sundstrand Co.,* 116 F.3d 321, 324 (8th Cir.1997). A jury verdict must be affirmed " 'unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party.' " *Stockmen's Livestock Mkt., Inc. [v. Norwest Bank of Sioux City* ], 135 F.3d 1236, 1240–41 (8th Cir.1998) (quoting *Chicago Title Ins. Co. v. Resolution Trust Corp.,* 53 F.3d 899, 904 (8th Cir.1995)).

*Cross v. Cleaver,* 142 F.3d 1059, 1066 (8th Cir.1998); *accord Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.") (citations omitted). Thus, this standard requires the court to:

"[C]onsider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Community Dev. Agency v. Lake Calhoun Assoc.*, 928 F.2d 299, 301 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 989 (8th Cir.1989)); *see also Stephens v. Johnson*, 83 F.3d 198, 200 (8th Cir.1996) (citing *Whitnack v. Douglas County*, 16 F.3d 954, 956 (8th Cir.1994), in turn, quoting *Hastings v. Boston Mut. Life Ins. Co.*, 975 F.2d 506, 509 (8th Cir.1992)); *Haynes v. Bee–Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir.1996); *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 800 (8th Cir. 1994) (reiterating these factors, citing *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992)); *McAnally v. Gildersleeve*, 16 F.3d 1493, 1500 (8th Cir.1994) (same).

■ This standard for consideration of a motion for judgment as a matter of law accords the jury's verdict substantial deference. *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995); *McAnally*, 16 F.3d at 1500. However, even with this deference to the jury's verdict, the jury cannot be accorded "the benefit of unreasonable inferences, or those 'at war with the undisputed facts.' " *McAnally*, 16 F.3d at 1500 (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir.1989), in turn, quoting *Marcoux v. Van Wyk*, 572 F.2d 651, 653 (8th Cir.1978)). " 'While [the court] [is] compelled to accord the utmost respect to

jury verdicts and tread gingerly in reviewing them, [the court] [is] not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdict if the evidence cannot support it.' " *Ocheltree v. Scollon Productions, Inc.*, 308 F.3d 351, 355 (4th Cir.2002) (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996) (internal citations omitted)), *rehearing en banc granted, opinion vacated on other grounds* (Dec. 16, 2002). Nevertheless, the court must still defer to the jury's resolution of conflicting testimony. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Having reviewed the applicable standards, the court turns to an examination of the claims raised in John Morrell's motion for judgment as a matter of law to determine whether post-trial relief from the jury's verdict against John Morrell is appropriate.

### 2. Sufficiency of the evidence—sexual harassment

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). A hostile work environment sexual harassment claim requires that the plaintiff show:

(a) she is a member in a protected group; (b) she was subject to unwelcome sexual harassment; (c) the harassment was based on sex; (d) the harassment affected a term, condition, or privilege of employment; and (e) the employer knew or should have known of the harassment and failed to take proper remedial action.

*Stuart v. General Motors Corp.*, 217 F.3d 621, 631 (8th Cir.2000). John Morrell contends that Baker failed to prove the final three elements of her sexual harassment claim—namely, that the harassment she was subjected to while an employee at John Morrell was based on her sex, that the harassment affected a term, condition, or privilege of her employment, and that John Morrell failed to take proper remedial action.

### a. Based on sex

John Morrell argues that Baker did not establish at trial that the harassment she endured was "based on" her gender. John Morrell argued to the jury and reasserts here in its post-trial motion that Baker's harassers, Jeff Eichmann and Brian Murphy, were "equal opportunity harassers" who treated male co-workers as poorly as they treated Baker. John Morrell concedes that Eichmann's and Murphy's behavior was "rude, boorish, offensive, short-tempered, obnoxious, and demeaning," but insists that the behavior "was simply workplace conflict exacerbated by the stresses of working on a production line where one worker's performance constantly affects the other." [Deft.'s JAML br. at 3–4].

■ "Employees are entitled to a workplace free from 'discriminatory intimidation, ridicule, and insult' motivated by the employees' membership in a protected class." *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir.1997)). In *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958 (8th Cir.1999), the Court of Appeals for the Eighth Circuit examined the "based on sex" prong of a sexual harassment claim. The court explained:

> Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *See Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 358 (8th Cir. 1997) (*Montandon*); *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (*Quick*) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (*Harris*) (Ginsburg, J., concurring)). Stated differently, the harassment must be based on the complaining person's sex. *See Montandon*, 116 F.3d at 358. In *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (*Oncale*), the Supreme Court said: "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'"

*Scusa*, 181 F.3d at 965.

■ In *Scusa*, the plaintiff conceded that her harassers were, as John Morrell portrays Eichmann and Murphy to be, equal opportunity harassers and that they meted out their offensive conduct to both men and women. *Id.* The *Scusa* plaintiff testified that her harassers berated her because of factors unrelated to her sex. *Id.* In Baker's case, there was ample evidence presented at trial that Murphy and particularly Eichmann treated all of their co-workers badly. However, there was more than sufficient evidence for a reasonable jury to conclude that they treated Baker and other women differently—indeed, worse—than they treated men.

■ Much of the evidence the jury heard was undeniably gender-based. While harassment alleged to be because of

sex need not be explicitly sexual in nature,[4] *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 (8th Cir.1997), Baker presented ample evidence that was explicitly sexual. For instance, Eichmann and Murphy made sexually tinged "hip thrusting" gestures to Baker and sexually derogatory comments about her. Furthermore, the jury heard evidence that Murphy told Baker that he "wondered what she looked like without her clothes on" and asked her out on a date. Baker also testified that Eichmann rubbed his groin up against her and told co-workers that she invited him to her house and answered the door with nothing on but an open robe. In addition, there was testimony that women were subjected to "hooting and hollering" in the cafeteria at John Morrell and could not apply Chapstick without receiving lascivious comments from male co-workers. These acts carry with them clear sexual overtones and permit an inference of gender-based harassment. *See Bowen v. Missouri Dept. of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir.2002) (reversing district court's grant of summary judgment where district court ruled there was no evidence that co-worker's conduct was "based on race" and holding that co-worker's reference to plaintiff as a "white bitch" was sufficient evidence for a reasonable jury to conclude that the harassment was race-based) (citing *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir.

1999)) (hostile work environment based on sex) (agreeing with *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir.1999)).

Moreover, Eichmann and Murphy frequently referred to Baker as a "stupid bitch." The Eighth Circuit has held that use of the term "bitch" and other sexually explicit conduct may give rise to an inference of gender-based discrimination:

> Although workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998), gender-based insults, including the term "bitch," may give rise to an inference of discrimination based on sex, *see Burns v. McGregor Electronic Industries, Inc.*, 989 F.2d 959, 964 (8th Cir.1993); *see also Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000–01 (10th Cir.1996); 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 808 (3d ed.1996) (citing cases).

*Carter*, 173 F.3d at 700–01.

■ Indeed, John Morrell's own witness, Marilyn Alcantar, a supervisor at John Morrell, testified that Eichmann treated both men and women rudely but that he treated women worse than men and with an air of superiority. Baker similarly testified, as did a current John

---

4. The First Circuit Court of Appeals aptly described the import of harassment that is not explicitly sexual in sexually hostile work environment cases. *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 20 (1st Cir.2002). The court explained: "Our cases make clear that, 'where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim.'" *Id.* (quoting *O'Rourke v. City of Providence* 235 F.3d 713, 729 (1st Cir.2001)). Non-sexually explicit harassment cannot be viewed in a vacuum but instead must be considered as part of the totality of the circumstances. *See id.; accord Cruzan v. Special Sch. Dist, # 1*, 294 F.3d 981, 984 (8th Cir.2002) ("Courts examine the totality of the circumstances, and consider whether a reasonable person would have found the environment hostile or abusive.") (citing *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 755 (8th Cir.2001)); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326–27 (8th Cir.1994) (court must look to totality of circumstances in assessment of hostile work environment).

Morrell employee, Kay Nilson, and a former John Morrell employee, Georgia Risley. In fact, the jury heard evidence that Eichmann referred to Risley as a "fat cow"—a reference that is relevant to the gender-based inquiry. *See Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 571, 574 (8th Cir.1997) (affirming hostile work environment jury verdict and noting that one of plaintiff's harassers referred to a female employee as a "fat bitch," "stupid," and "dummy," which was evidence of gender-based discrimination). In cases where the alleged harasser directed offensive behavior at both men and women, a plaintiff " 'need not show ... that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment.' " *Duncan v. General Motors Corp.,* 300 F.3d 928, 934 (8th Cir.2002), *petition for cert. filed,* 2003 WL 447149, 71 USLW 3552 (Feb. 13, 2003), (quoting *Beard v. Flying J, Inc.,* 266 F.3d 792, 798 (8th Cir.2001)); *accord Quick,* 90 F.3d at 1378 (finding that evidence that members of one sex were the primary targets of harassment is sufficient to show conduct is gender-based) (citations omitted).

In *Beard v. Flying J, Inc.,* 266 F.3d 792 (8th Cir.2001), the Eighth Circuit Court of Appeals rejected the defendant's argument—like John Morrell's argument here—that the alleged harassment was not "based on sex," because the alleged harasser subjected males to the same kind of conduct that was the basis for the female plaintiff's sexual harassment claim. *See Beard,* 266 F.3d at 798. More specifically, the defendant in that case argued that, because of the harasser's like conduct toward males, "women were not 'exposed to disadvantageous terms or conditions of employment to which [males were] not exposed,' " as required to show that the conduct was "based on sex." *Id.* (quoting *Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir.2000)). However, the Eighth Circuit Court of Appeals concluded that in a case supposedly involving the same conduct toward men and women,

> [a] plaintiff ... need not show ... that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment. *See Quick v. Donaldson Co.,* 90 F.3d 1372, 1378 (8th Cir.1996). Viewing the evidence in the light most favorable to [the plaintiff] a jury could reasonably find that the vast majority of [the harasser's] activities of a harassing nature was directed toward female employees, and could thus conclude that the harassment of [the plaintiff] was based on sex.

*Beard,* 266 F.3d at 798; *accord Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (although Title VII's prohibition against sex discrimination protects men as well as women and harassing conduct need not be motivated by sexual desire to support inference of sex discrimination, critical issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of other sex are not). John Morrell's argument is in conflict with the evidence Baker presented at trial, which supports a finding that Murphy and particularly Eichmann subjected all John Morrell employees to rude behavior, but subjected Baker exclusively to sexually offensive and threatening conduct. *See id.* The court cannot simply choose to disbelieve Baker's testimony, even if it is not corroborated.

Furthermore, the Eighth Circuit Court of Appeals recognized that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. Harassment alleged to be because of sex need not be explicitly sexual in nature." *Carter v.*

*Chrysler Corp.*, 173 F.3d 693, 700–01 (8th Cir.1999) (internal citations omitted). Here, Baker produced sufficient evidence to support the inference that, while Eichmann may have treated all employees with disdain, he targeted his harassment towards women.

Alcantar's testimony is also relevant to the inquiry of whether Baker was subjected to gender-based harassment. She testified that the milieu on the plant floor was biased against women and that there was a sense that the packing house industry was still "a man's world" and that many of the male hourly employees felt that certain jobs should not be performed by women. [Tr., at 1250–52]. Much of the evidence presented at trial regarding Eichmann's boorish and degrading conduct echoed this testimony: Eichmann felt that he could do his job better than anyone else, particularly women, and he was not shy about intimidating others, again, particularly women, and forcing them to comply with his way of working the production line, even when it involved pushing and shoving women on the production line.

In short, the jury rejected John Morrell's "equal opportunity harasser" argument: there was more than sufficient evidence upon which a reasonable jury could find that Baker was treated more harshly than males, even though there was some evidence that Eichmann treated all of his coworkers badly. Further, there was no evidence presented at trial that Murphy treated anyone but Baker with disdain. The court concludes that Baker produced sufficient evidence from which reasonable jurors could infer that Eichmann's and Murphy's conduct toward her was based on sex. Therefore, the court denies John Morrell's motion for judgment as a matter of law on this point, finding that the evidence supports the jury's conclusion that Baker was subjected to harassment because of her sex.

### b. *Severe or pervasive*

Next, John Morrell contends that, even if Eichmann's and Murphy's treatment of Baker was "based on [her] sex," it was not sufficient, as a matter of law, to affect a term, condition, or privilege of employment, *see Beard*, 266 F.3d at 797 (fourth element), in that it was not sufficiently "severe or pervasive." It argues that the evidence does not support a finding that the harassment was sufficiently severe or pervasive as to have affected a term, condition, or privilege of her employment. Baker, of course, disagrees and asserts that Eichmann's and Murphy's repeated harassment, teasing, mimicking, throwing boxes, physical threats, lewd hip thrusts, remarks about her body, rumors, and offensive comments affected the conditions of her employment. She also argues that her supervisor, Kathi Brown–Rowley, discriminatorily denied her breaks and assistance, which she further contends affected the conditions of her employment. Moreover, Baker argues that John Morrell's Human Resources Director, Steve Joyce, affected the conditions of her employment by repeatedly failing to correct the harassing conduct toward Baker and commenting that Baker and Eichmann merely "had a hard-on for each other." This conduct, Baker argues, led to extreme mental trauma and depression and prevented her from working at John Morrell.

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 (alteration provided by *Meritor* Court) (citations omitted); *accord Stuart*, 217 F.3d at 631 (same). A "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one

that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)

■ In determining whether the plaintiff has met this stringent threshold, "[w]orkplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances.'" *Bowen,* 311 F.3d at 884 (citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367))). Moreover, "[a] claimant need only establish discriminatory conduct which is either pervasive or severe." *Id.* at 884 (citing *Harris,* 510 U.S. at 22, 114 S.Ct. 367). "A workplace permeated with 'discriminatory intimidation, ridicule, and insult' is sufficiently severe to establish a hostile work environment." *Kimzey,* 107 F.3d at 573 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citing *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399)).

■ Whether or not a plaintiff's work environment is sufficiently permeated with harassment so as to affect a term, condition, or privilege of employment bears on an examination of several relevant factors. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. In the Eighth Circuit, these factors include: "the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, whether it unreasonably interferes with the employee's work performance, physical proximity to the harasser, and the presence or absence of other people." *Carter,* 173 F.3d at 702 (internal citations omitted); *accord Clearwater v. Indep. Sch. Dist. No. 166,* 231 F.3d 1122, 1128 (8th Cir.2000) ("In determining whether the alleged harassment is actionable, the totality of the circumstances must

be considered, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.") (internal citations omitted).

The crux of John Morrell's argument is that Baker failed to show that the harassment she experienced was anything more than "mere offensive behavior," which may be rude and inappropriate but is not within the purview of Title VII. John Morrell relies heavily upon the Eighth Circuit's decision in *Duncan v. General Motors Corp.,* 300 F.3d 928 (8th Cir.2002) for its proposition that Baker was not subjected to actionable harassment. In that case, a supervisor, James Booth, sporadically harassed the plaintiff, Diana Duncan, over a two-year period. *Id.* at 931–33. Though Booth's behavior was clearly offensive and extremely disrespectful, the Eighth Circuit held that it did not rise to the level of actionable harassment because the offending conduct was so isolated. *See id.* at 931–33. The majority characterized the sex-based harassment as follows: "a single request for a relationship, which was not repeated when [Duncan] rebuffed it, four or five isolated incidents of Booth briefly touching her hand, a request to draw a [sexually explicit] planter, and teasing in the form of a poster and beliefs for an imaginary [man hater's] club." *Id.* at 935.

■ "There is no bright line between sexual harassment and merely unpleasant conduct, so a jury's decision must generally stand unless there is trial error." *Hathaway v. Runyon,* 132 F.3d 1214, 1221 (8th Cir.1997). Viewing the evidence in the light most favorable to Baker, as the court must, the court finds that Baker presented sufficient evidence that she was subjected to severe and pervasive harassment that was significantly more than "un-

pleasant conduct" and "mere offensive behavior."

Baker's case is easily distinguishable from the facts of *Duncan*. First, Eichmann yelled at Baker and criticized her ability to perform her job. He berated and humiliated her on the plant floor. Moreover, Baker presented evidence that he turned boxes on his end of the production line, which impeded her ability to efficiently and speedily weigh the boxes when they ultimately came down the line to her weighing station. The totality of Eichmann's behavior undermined Baker's ability to do her job. In *Duncan*, Booth exhibited boorish and chauvinistic behavior, but his conduct did not impede the plaintiff from performing her job. *See Duncan*, 300 F.3d at 934–35. Furthermore, Baker presented evidence that she was discriminatorily denied bathroom breaks by a former supervisor, Ron Ridge, and by his successor, Brown–Rowley. Baker also presented evidence that Brown–Rowley provided Baker's male-counterpart on the night shift with assistance to perform certain functions of the Computer Scale Operator job but denied Baker's request for assistance. This, similarly, affected her ability to perform the functions of her job—evidence that was not presented in *Duncan*.

An analysis of the relevant factors also compels the conclusion that Baker presented sufficient evidence on the fourth element of her sexual harassment claim. Unlike in *Duncan*, Baker proved that Eichmann's and Murphy's harassment was frequent, severe, humiliating, and interfered with her work performance. *See, e.g., Duncan*, 300 F.3d at 934 (listing these factors). First, Baker was subjected to frequent harassing behavior, which counsels in favor of a finding that the harassment was severe and pervasive. *See Clearwater*, 231 F.3d at 1128 (stating that frequency is a relevant factor). John Mor-

rell attempts to minimize the frequency of the harassing behavior by offering a time-line of the behavior in its post-trial brief. Only by turning a blind eye to the evidence presented at trial can the court place any credence in John Morrell's version of the evidence.

■ In any event, John Morrell's version is contrary to the standard governing motions for judgment as a matter of law because that standard compels the court to view the evidence in the light most favorable to the nonmoving party—here, the plaintiff. *E.g., Stockmen's Livestock Mkt., Inc.*, 135 F.3d at 1240–41. The facts John Morrell offers in support of its post-trial motion are those most favorable to its position, and John Morrell discredits the plaintiff's evidence when it contradicts the evidence John Morrell presented. Because it is solely the jury's province to make such credibility determinations, the court cannot do as John Morrell does and minimize the frequency and severity of the harassing conduct in this case by ignoring the plaintiff's evidence. *See Troknya v. Cleveland Chiropractic Clinic*, 280 F.3d 1200, 1206 (8th Cir.2002) ("Judgment as a matter of law is appropriately granted, notwithstanding a jury verdict, when, upon viewing the evidence in the light most favorable to the nonmoving party and *without weighing evidence or making credibility determinations*, the court determines that the evidence is not susceptible to any reasonable inference sustaining the nonmoving party's position.") (emphasis added) (citing *Summit v. S–B Power Tool*, 121 F.3d 416, 420–21 (8th Cir.1997)); *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir.2001) (" 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' ") (quoting *Reeves*, 530 U.S. at 150–151, 120 S.Ct. 2097). It bears repeating

that, in ruling on a motion for judgment as a matter of law, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Phillips*, 256 F.3d at 847 (citing *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097).

Here, the evidence was sufficient to allow a reasonable jury to find that Eichmann and Murphy constantly directed "hip thrusting" gestures toward Baker, that Eichmann regularly referred to Baker as a "bitch," "stupid bitch," "dumb bitch," and "dumb blonde," and that Eichmann constantly mimicked and made fun of Baker by making crying sounds regarding Baker's requests to use the bathroom as a consequence of her medical condition.

Moreover, Baker endured other isolated but serious acts of harassment. When viewed in light of the cumulative effect of the established plant-wide discriminatory animus toward women and the nearly daily harassment she personally suffered, they demonstrate that Baker was subjected to frequent harassment that pervaded her working environment. Moreover, at minimum, the evidence established that Eichmann's and Murphy's discriminatory conduct towards Baker was not infrequent, which is sufficient to survive the defendant's motion for judgment as a matter of law on this point. *See Bowen*, 311 F.3d at 885 (reversing district court's grant of summary judgment and finding that plaintiff generated a jury question on whether her work environment was sufficiently permeated with harassment, stating "Our independent review of the evidentiary record leads us to conclude Bowen produced sufficient evidence to demonstrate the cumulative effect of Lee's discriminatory conduct

towards her was sufficiently severe to defeat summary judgment. While Lee's discriminatory conduct towards Bowen was not frequent, neither was it infrequent.").

These other discriminatory acts, which the jury reasonably could have found existed, include: Eichmann telling other male co-workers that he had been to Baker's home and had "played with" her "pussy" and that it was "black;" Murphy asking Baker for a date, leaving a note on her car asking Baker to call him, giving her a Wonder Woman PEZ candy dispenser and stating that it was Wonder Woman because he "wondered" what Baker looked like naked, spreading rumors that Baker was "good in the sack" and that he had been to Baker's house and she had answered the door in a robe with her "tits hanging out." On another occasion, Eichmann walked past Baker and proceeded to grab her arms from behind and, in a mocking fashion, said "Excuse me" as he pressed his groin into Baker. Baker also testified that Eichmann had thrown boxes at her. Moreover, she described a particularly violent encounter with Eichmann in the company parking lot in which he sped directly at her in his truck while she was walking, coming to a screeching halt inches from crashing into her.

The other relevant factors the Eighth Circuit has identified as a consideration in determining whether a work environment was sufficiently severe or pervasive to support a hostile work environment sexual harassment claim are: whether the harassment was physically threatening or humiliating, whether it unreasonably interfered with the employee's work performance, physical proximity to the harasser, and the presence or absence of other people. *E.g., Carter*, 173 F.3d at 702 (internal citations omitted). Without rehashing the evidence presented at trial and mentioned above, it suffices to say that consideration

of each of the factors weigh in favor of finding that Baker presented legally sufficient evidence on the fourth element of her sexual harassment claim. All of Eichmann's and Murphy's harassing conduct directed toward Baker was humiliating— namely, the mimicking of her need to use the bathroom, the sexual comments, and referring to her as "stupid" and as a "bitch," in particular. And some of it was physically threatening. The incident in the parking lot, in particular, was incredibly dangerous and understandably placed Baker in imminent fear of her safety. In addition, some of the offensive conduct involved physical touching. The jury heard evidence that Eichmann threw boxes at Baker and, on one occasion, thrust his groin into her.

In *Bowen v. Missouri Department of Social Services*, 311 F.3d 878 (8th Cir. 2002), the Eighth Circuit reversed the district court's conclusion that the plaintiff had failed to generate a genuine issue of material fact as to whether she was subjected to harassment that was sufficiently severe of pervasive to be actionable. The *Bowen* court made clear that the cumulative effect of the harassing conduct is of considerable importance in making this determination. *See id.* at 885. This focus on the cumulative effect is in-line with prior Eighth Circuit caselaw, which holds that "[t]he touchstone for a Title VII hostile environment claim is whether the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Dowd v. United Steelworkers of America, Local No. 286*, 253 F.3d 1093, 1101–02 (8th Cir.2001) (internal quotations omitted) (citing *Quick*, 90 F.3d at 1378 (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367)). Indeed, the Tenth Circuit has poignantly observed that "one of the critical inquiries in a hostile environment claim

must be the *environment*. Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987) (cited with approval in *Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010, 1014 (8th Cir.1988)).

■ While there is no "mathematically precise test" for determining when conduct in the workplace moves beyond "merely offensive" and into the realm of illegality, *Harris*, 510 U.S. at 17, 114 S.Ct. 367, " '[s]ubject to some policing at the outer bounds,' it is for the jury to weigh [the] factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 19 (1st Cir.2002) (quoting *Gorski v. New Hampshire Dep't of Corrections*, 290 F.3d 466, 474 (1st Cir.2002)). Here, a reasonable juror could have determined that the sexual harassment and overall degrading conduct directed towards Baker was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," *Quick*, 90 F.3d at 1378. Moreover, the evidence wholly supports an inference that the plant floor at John Morrell was permeated by a misogynist atmosphere and by chauvinistic attitudes. It is reasonable to conclude that this atmosphere, where women are looked down upon as inferior to men, heightened Baker's sense of the severity and pervasiveness of the harassment she suffered. Gender-based harassment satiated her working environment at John Morrell and cannot be explained away as being "mere offensive conduct," resulting from a personality clash and the "meat packing plant culture."

On this point, *Estes v. Georgetown University*, 231 F.Supp.2d 279 (D.D.C.2002), is

instructive. In *Estes,* the district court rejected an argument very similar to John Morrell's contention that the plant-wide environment does not rise to the level of actionable harassment. The court reasoned:

> There is no bright-line formula or legal standard ... for determining whether the "locker-room atmosphere" described by Ms. Estes was "severe or pervasive." Judgment as a matter of law is appropriate where there is evidence of only isolated comments, teasing, or. offhand comments, *Stewart v. Evans,* 275 F.3d 1126, 1133–34 (D.C.Cir.2002); *Kidane v. Northwest Airlines, Inc.,* 41 F.Supp.2d 12, 16 (D.D.C.1999) (citing *Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir. 1981)), but Ms. Estes testified that the comments, such as the physical attributes of female employees, were frequent and that the "locker-room" atmosphere of which she complained, pervasive. It was for the jury to decide whom to believe on the question of whether the evidence taken as a whole crossed the line between mere vulgarity, which is not intended to be "purge[d] [from] the workplace" by Title VII, *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995), and offensive conduct that was sufficiently severe or pervasive to alter conditions of employment.

*Estes,* 231 F.Supp.2d at 281–82.

Here, Baker and other witnesses (both male and female and called by both Baker and by John Morrell) testified to the anti-women sentiment that permeates the plant floor at John Morrell. Baker also testified extensively as to the derogatory and demeaning conduct directed at her specifically. Accordingly, the court concludes that there was more than sufficient evidence presented at trial from which a reasonable jury could conclude that the harassment directed towards Baker was severe or pervasive so as to have affected a term, condition, or privilege of her employment.

John Morrell next argues that, because Baker did not demand Eichmann's termination when Steve Joyce, the director of human resources, asked for her input as to the appropriate disciplinary action that should be taken against Eichmann, her working environment could not have been hostile within the meaning of Title VII. It cites *Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 844 (8th Cir.2002) in support of its argument. In *Woodland,* the Court of Appeals for the Eighth Circuit affirmed the district court's grant of summary judgment against the plaintiff on his Title VII racially hostile work environment claim. *Id.* at 844. John Morrell focuses on one statement in particular in the *Woodland* decision, takes it out of context, and argues that it stands for the proposition that, because Baker did not demand Eichmann be fired, her work environment was not sufficiently hostile. In *Woodland,* the plaintiff was one of very few African Americans employed in the defendant's steel factory. *Id.* The plaintiff testified that "the plant was rife with co-worker racial hostility that created for him an unlawful hostile work environment." *Id.* at 843. However, he was only able to point to one racially-motivated act of harassment that was directed specifically towards him. *Id.* at 843–44. On that occasion, the plaintiff's supervisor overheard another employee refer to the plaintiff using a racial epithet. *Id.* The supervisor reported the incident to the plant manager who then told the plaintiff "all I need you to do ... is come in and sign a complaint against him and I'll fire him." *Id.* The plaintiff, however, told the plant manager that he would prefer to forget about the incident. *Id.*

The court emphasized that an actionable hostile work environment is one that is both objectively and subjectively abusive. *Id.* at 843. A Title VII plaintiff must

perceive her working environment to be hostile because "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* On the issue of whether the *Woodland* plaintiff subjectively perceived his workplace to be abusive, the court held that the fact he was offered the opportunity to have his harasser discharged but declined was relevant to his perception of the working environment. *See id.* at 844. The court reasoned that the plaintiff's choice in preferring to forget about the incident rather than to take action "was strong evidence that, while offensive, these incidents did not subjectively affect the conditions of Woodland's employment." *Id.*

Baker's case is readily distinguishable from *Woodland.* John Morrell never told Baker that it would discharge Eichmann if she so chose. Instead, it asked her an open-ended question about how she would like the situation with Eichmann resolved. Baker responded that she simply wanted it to end, whereas the *Woodland* plaintiff simply wanted to forget about it. Unlike Woodland's choice, Baker's choice demonstrates that she indeed perceived her working environment to be abusive. In addition, Baker adduced ample evidence at trial that she subjectively believed her working conditions were altered by the harassment. Unlike Woodland, she complained of the harassment on numerous occasions.

Moreover, John Morrell conceded at trial that when Baker lodged one particular complaint with Joyce, he expressed frustration and told her that she and Eichmann had a "hard on" for each other and instructed her to try to get along with him. In *Woodland,* the Eighth Circuit noted that, with regard to the incidents of objectively abusive racial harassment that the plaintiff did object to, the defendant acted promptly to remedy the situation. *Id.* Joyce's crude comment in the face of Eichmann's demonstrated and continuous pattern of harassing behavior towards Baker, coupled with John Morrell's failure to adequately respond to Baker's complaints, is the antithesis of the prompt and decisive remedial action taken by the *Woodland* defendant and warrants a different result than that reached by the *Woodland* court.

Based on the frequency of the harassment, its severity and physically threatening nature, its intent to humiliate, degrade, and belittle the plaintiff, its actual interference with Baker's work performance, its impact on Baker's psychological well-being, and its omnipresence in John Morrell's Sioux City, Iowa plant, the court finds that Baker produced sufficient evidence from which a reasonable jury could conclude that she demonstrated that the cumulative effect of the harassment she suffered satisfied the fourth element of her sexual harassment claim. Therefore, the court overrules John Morrell's contention that it is entitled to judgment as a matter of law on this ground as well.

### c. *Proper remedial action*

John Morrell's final argument on its challenge to the sufficiency of the evidence regarding Baker's *prima facie* case of sexual harassment is that no reasonable jury could conclude that John Morrell failed to take appropriate measures to respond to Baker's complaints and end the harassment.[5] Baker resists, pointing in particu-

---

5. John Morrell did not contend in its moving papers that it did not have knowledge of the harassment. Instead, John Morrell solely focused on the adequacy of its remedial actions. The court notes, however, that the evidence compels the conclusion that John Morrell was aware of the harassment Baker was experiencing, based on Baker's numerous complaints to Joyce and as evidenced by Joyce's personal notes of some of those complaints.

lar to the years of reported ongoing harassment she suffered at the hands of, among others, one individual who was reprimanded only once despite Baker's and other female employees' numerous complaints.

The Eighth Circuit Court of Appeals has instructed that "[o]nce an employee complains to her employer about sexual harassment by a coworker, the employer is on notice and must take proper remedial action to avoid liability under Title VII." *Hathaway v. Runyon,* 132 F.3d 1214, 1222 (8th Cir.1997) (citing *Davis v. Tri–State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir.1992)); *Zirpel v. Toshiba Am. Information Sys., Inc.,* 111 F.3d 80, 81 (8th Cir.1997) (finding an employer must take prompt remedial action after it knew or should have known of harassment). In addition to conducting an investigation, the employer must take " 'prompt remedial action reasonably calculated to end the harassment.' " *Hathaway,* 132 F.3d at 1222 (citing *Davis,* 981 F.2d at 343); *Zirpel,* 111 F.3d at 81 (holding that summary judgment was properly granted in an employer's favor because the employer "promptly took 'remedial action . . . reasonably calculated to end the harassment' " once it knew or should have known about a harassing co-employee's behavior) (citing *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993)). The employer cannot avoid liability by doing nothing simply because the co-worker denies that the harassment occurred. *Hathaway,* 132 F.3d at 1222 (citing *Fuller v. City of Oakland, Cal.,* 47 F.3d 1522, 1529 (9th Cir.1995)). Indeed, an employer may take remedial action even where a complaint is uncorroborated. *Hathaway,* 132 F.3d at 1222 (citing *Knabe v. Boury Corp.,* 114 F.3d 407, 409, 413 n. 11 (3d Cir.1997)).

The Eighth Circuit Court of Appeals has observed that factors a court may consider when assessing the reasonableness of an employer's remedial measures include:

> the amount of time elapsed between the notice of harassment, which includes but is not limited to a complaint of sexual harassment, and the remedial action, and the options available to the employer such as employee training sessions, disciplinary action taken against the harasser(s), reprimands in personnel files, and terminations, and whether or not the measures ended the harassment.

*Stuart,* 217 F.3d at 633 (citing *Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999)); *accord Rheineck v. Hutchinson Tech., Inc.,* 261 F.3d 751, 756 (8th Cir. 2001) (citing *Stuart,* 217 F.3d at 633). Options for appropriate remedial action include taking disciplinary action to stop the harassment; transferring the alleged harasser to a different area where he or she would not come in contact with the complainant; scheduling the individuals involved on different shifts; putting a signed written warning or reprimand in personnel files; or placing the offending employee on probation pending any further complaints. *Hathaway,* 132 F.3d at 1222 (citing *Knabe,* 114 F.3d at 413; *Zirpel,* 111 F.3d at 81; *Intlekofer v. Turnage,* 973 F.2d 773, 780 n. 9 (9th Cir.1992); *Ellison v. Brady,* 924 F.2d 872, 881–82 (9th Cir.1991); *Barrett v. Omaha Nat'l Bank,* 726 F.2d 424, 426 (8th Cir.1984)).

In this case, the evidence establishes that Baker complained about Eichmann and Murphy upwards of 15 times, as well as having complained about Brown–Rowley's treatment of her. John Morrell presented evidence that it performed a cursory investigation of some of those claims, but Joyce testified that he never considered them to be or explored the possibility that they were "sexual harassment" complaints. John Morrell spoke to Baker's harassers but only formally disci-

plined Eichmann on one occasion. With respect to that incident, John Morrell placed a letter of discipline in his personnel file. Eichmann's file contained no other references to the complaints Baker lodged against him. Indeed, with the exception of one assault complaint against him by another female employee, Eichmann's personnel file was bereft of evidence that should have been a red flag to John Morrell that Eichmann posed a problem to its female employees. The jury heard evidence that other employees complained of harassment by Eichmann, but his personnel files did not reflect this pattern of harassment.

In addition, while John Morrell issued one formal disciplinary letter against Eichmann, on the majority of occasions on which it took any action, it simply instructed the parties to "get along." The jury easily could have concluded that this "remedial action" was not reasonably calculated to end the harassment. Indeed, in light of the fact the harassment continued unabated for years and John Morrell continued to employ the same strategy to deal with the problem, the jury could have concluded that John Morrell's remedial action was wholly unreasonable, especially because it had a demonstrated history of ineffectiveness.

And while John Morrell maintained a clear chain-of-command for making complaints, which Baker utilized, the jury also heard evidence that Baker was discouraged from reporting harassment. Joyce admitted that he told Baker and Eichmann that they had a "hard-on" for each other and that they should work it out between themselves. In addition, Baker testified that Brown–Rowley told Baker that Joyce was tired of seeing her and did not want to hear her complain anymore. Moreover, Baker testified that when she complained to Brown–Rowley about her unfair workload or about bathroom breaks, Brown–

Rowley told her to "shut the fuck up" and that she was "sick of Baker's shit." Baker reported these incidents to Joyce. Joyce contacted Brown–Rowley about Baker's allegations, but, when Brown–Rowley denied them, Joyce concluded there was insufficient evidence of discrimination. He merely instructed Brown–Rowley to be sensitive about the situation and never contacted Baker to discuss the status of her complaint.

John Morrell never considered moving Murphy or Eichmann from the scale area, suspending him, or providing him training. Instead, it issued a single letter of reprimand after more than one dozen complaints. Given Eichmann's long history of harassing behavior towards Baker and other female John Morrell employees, Baker's vocalized aversion to her working conditions, the overtly sexual language directed towards Baker and admitted to by Murphy and Eichmann, and the years of harassment that never ceased, the jury could reasonably have determined that John Morrell's actions were not reasonable. Accordingly, the court cannot say that no reasonable jury could have concluded that Baker proved by the greater weight of the evidence the fifth element of her sexual harassment claim against John Morrell.

#### d. Summary

Upon viewing the evidence in the light most favorable to the plaintiff, without weighing evidence or making credibility determinations, the court concludes that the jury reasonably could have drawn the necessary factual inferences to satisfy each element of her hostile-work-environment sexual harassment claim. Baker produced sufficient evidence to establish her hostile work environment claim as a matter of law, and on this evidence a reasonable jury could find that Baker was treated differently because of her sex and that she

worked in a hostile environment that "altered the conditions" of her employment. Therefore, the court denies John Morrell's motion for judgment as a matter of law on this claim and turns next to John Morrell's contention that it is entitled to judgment as a matter of law on Baker's retaliation claim.

### 3. Sufficiency of the evidence—retaliation

■ Under the sexual discrimination provisions of Title VII, 42 U.S.C. § 2000e–3(a), an employer is forbidden from retaliating against employees for opposing sexual discrimination.[6] *Bogren v. Minnesota,* 236 F.3d 399, 407 (8th Cir.2000), *cert. denied,* 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1007 (8th Cir.2000). To survive John Morrell's motion for judgment as a matter of law on her retaliation claim, Baker must have established at trial the following by the greater weight of the evidence: (1) she engaged in protected activity; (2) her employer subsequently took adverse employment action against her; and (3) the adverse action was causally linked to her protected activity. *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 685 (8th Cir.2001) (quoting *Bogren,* 236 F.3d at 407); *Buettner v. Arch Coal Sales Co.,* 216 F.3d 707, 713–14 (8th Cir.2000). *Thorne v. Welk Inv., Inc.,* 197 F.3d 1205, 1210 (8th Cir.1999); *Scusa v. Nestle USA,* 181 F.3d 958, 968 (8th Cir.1999); *Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 818 (8th Cir.1998); *Cross v. Cleaver,* 142 F.3d 1059, 1071 (8th Cir.1998); *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1245 (8th Cir.1998); *Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir. 1997). In addition, the Supreme Court, in *Clark County School District v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), enunciated a reasonableness requirement that a plaintiff must satisfy in order to sustain his or her claims of retaliation. A plaintiff's proof of retaliation must be established such that a reasonable person could believe that the alleged unlawful incident would violate Title VII's standard. *Id.*

In the final instructions submitted to the jury at the close of the case, the instruction on retaliation outlines Baker's allegations regarding what actions she contends were retaliatory. The pertinent instruction provides:

> Ms. Baker *contends* that John Morrell subsequently took adverse employment action against her consisting of management refusing to take active steps to prevent Eichmann and Murphy from further sexual harassment, knowing that there was a likelihood that it would continue and that it would be very disturbing to Ms. Baker. She also *alleges* adverse employment action consisting of Kathi Brown blaming Ms. Baker for reporting the harassment to John Morrell and the Civil Rights Commission when she told Ms. Baker she "was sick of (her) shit and that she (Baker) drug her into the whole mess" and telling her to "shut the fuck up"; adding work to Ms.

---

6. Section 2000e–3(a) provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to dis- criminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

Baker's job; refusing to provide help to her, even though Ms. Brown provided help to other, similarly situated, employees; and by refusing to give Ms. Baker equal breaks. Finally, she *contends* that adverse employment action consisted of forcing her to quit her job, or "constructively discharging" her, which will be explained in more detail in Final Jury Instruction No. 7.

(Doc. No. 111, Final Instructions, at 27).

John Morrell does not contend that Baker did not engage in protected activity, but makes several challenges to the sufficiency of the evidence on the remaining two elements of Baker's retaliation claim. Specifically, it argues that the evidence does not support a finding (1) that John Morrell retaliated against Baker by making her job more difficult, (2) that John Morrell permitted the harassment to continue or that it did so in retaliation, and (3) that Baker was constructively discharged.[7]

### a. Increased job duties, refusal to assist, denial of breaks

### i. Adverse employment actions?

Baker presented evidence at trial that Brown–Riley added to her job responsibilities, refused to provide Baker with assistance, and denied her breaks in retaliation for Baker's opposition to sexual harassment at John Morrell. John Morrell contends that, because the jury found against

Baker on her disparate treatment claim, it concluded that she was not subjected to these adverse employment actions as a matter of law. John Morrell argues that "[i]n light of the jury's verdict in Defendant's favor as to Plaintiff's disparate treatment claim, this Court must conclude that the evidence does not support a finding that the Defendant's purported assignment of additional job duties was an 'adverse employment action' in regards to her claim of retaliation." [Deft.'s JAML br. at 19–20].

■■■ The court cannot accept John Morrell's argument because it fails to consider that the jury may have concluded that Baker was subjected to an adverse employment action but that the adverse action was motivated by something other than Baker's gender. For the jury to have found in Baker's favor on her disparate treatment claim, Baker would had to have proved that she suffered an adverse employment action under circumstances which give rise to an inference of unlawful sexual discrimination. *See Wensel v. State Farm Mut. Auto. Ins. Co.*, 218 F.Supp.2d 1047, 1062 (N.D.Iowa 2002) ("To prevail on a sex discrimination claim under a disparate treatment theory, [the plaintiff] must establish a *prima facie* case by presenting evidence that demonstrates: '(1) she was a member of a protected group; (2) she was

---

7. John Morrell also dedicates a significant portion of its brief to two arguments that have no bearing on this case. First, it argues that it would have discharged Baker in 1999 for abandoning her post without permission despite her opposition to harassment. The court agrees that, had this claim been submitted to the jury, it would have failed because John Morrell would have been able to prove its "same decision" defense as to this discharge. However, this claim was not submitted to the jury, and, therefore, it is irrelevant to Baker's retaliation claim because she did not allege that her 1999 discharge was retaliatory.

Second, John Morrell also argued in its post-trial brief that it could not be held liable for Eichmann's and Murphy's continued harassment of Baker because John Morrell did not "cause" their behavior. Again, Baker did not argue that the continuing harassment was retaliatory but rather that John Morrell failed to remedy the continued harassment in retaliation for her opposition to harassment. Hence, John Morrell's argument that it did not "cause" Eichmann's and Murphy's continued harassment is likewise irrelevant.

qualified for her position; and (3) she was discharged under circumstances giving rise to an inference of discrimination.' ") (quoting *Hanenburg v. Principal Mut. Life Ins. Co.,* 118 F.3d 570, 574 (8th Cir.1997) (citing *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996))). In other words, she would had to have proved by the greater weight of the evidence that she was subjected to adverse employment actions *because of her sex.*

Pertinent to her retaliation claim, Baker need not show that John Morrell was motivated by her gender when it added to her job duties, refused to provide her with assistance, and denied her bathroom breaks. Instead, she must establish that John Morrell took these actions in retaliation for her opposition to harassment. Thus, the verdict in favor of John Morrell on Baker's disparate treatment claim does not foreclose the jury from concluding that Baker was subjected to these adverse employment actions. Furthermore, it does not preclude a finding that the underlying motivation for these actions was retaliatory, even if the jury found that John Morrell was not motivated by gender discrimination.

The court finds that Baker presented sufficient evidence to show that her supervisor, Brown–Rowley, subjected her to the alleged adverse employment actions. Baker testified that Brown–Rowley added job responsibilities to Baker's scale operator position after Baker filed a charge of discrimination. These added duties caused Baker to make mistakes, for which Brown–Rowley consequently wrote up Baker. Baker also testified that additional job duties required her to assume some of the job responsibilities of quality control employees or forepersons, essentially requiring Baker to learn new skills.

Moreover, there was evidence that after Baker filed her discrimination charge, Brown–Rowley denied her assistance on the production line, refused to allow Baker to take bathroom breaks, and repeatedly yelled at her for making mistakes, which Baker testified were caused by the stress of her added job responsibilities. Brown–Rowley also swore at Baker and told her that she was upset that Baker "dragged her into the mess" between Baker and Eichmann. Brown–Rowley also discouraged Baker from making further complaints by telling her that Joyce did not want to hear her complain anymore.

This court has previously addressed the concept of "adverse employment action" in *Cherry v. Menard, Inc.,* 101 F.Supp.2d 1160 (N.D.Iowa 2000):

A constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces [the employee] to quit his [or her] job. *Klein v. McGowan,* 198 F.3d 705, 709 (8th Cir.1999) (citing *Kimzey,* 107 F.3d at 574); *see also Johnson v. Runyon,* 137 F.3d 1081, 1083 (8th Cir.) (internal quotations omitted), *cert. denied,* 525 U.S. 916, 119 S.Ct. 264, 142 L.Ed.2d 217 (1998) ("A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit."); *Summit v. S–B Power Tool,* 121 F.3d 416, 421 (8th Cir.1997) (internal quotations omitted), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1185, 140 L.Ed.2d 316 (1998) (citing same). The intent element is satisfied by a demonstration that quitting was "a reasonably foreseeable consequence of the employer's discriminatory actions." *Id.* The employee has an obligation to act reasonably by not assuming the worst and not jumping to conclusions too quickly. *See Howard v. Burns Bros., Inc.,* 149 F.3d 835, 841–42 (8th Cir.1998).

" '[I]ntolerability of working conditions is judged by an objective standard,

not the [employee's] subjective feelings.' " *Gartman v. Gencorp, Inc.*, 120 F.3d 127, 130 (8th Cir.1997) (quoting *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir.1996)). First, the conditions created by the employer must be such that a reasonable person would find them intolerable. *See Gartman*, 120 F.3d at 130; *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996); *Parrish v. Immanuel Medical Ctr.*, 92 F.3d 727, 732 (8th Cir.1996); *Allen*, 81 F.3d at 796; *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1420 (8th Cir.1995); *Smith [v. World Ins. Co.]*, 38 F.3d [1456,] 1460 [ (8th Cir.1994) ]; *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 284 (8th Cir.1993). Second, the employer's actions "must have been deliberate, that is, they 'must have been taken with the intention of forcing the employee to quit.' " *Delph*, 130 F.3d at 354 (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)); *Gartman*, 120 F.3d at 130; *Tidwell*, 93 F.3d at 494; *Parrish*, 92 F.3d at 732; *Allen*, 81 F.3d at 796; *Smith*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284. The Eighth Circuit Court of Appeals has explained that, "in the absence of conscious intent ..., the intention element may nevertheless be proved with a showing that the employee's 'resignation was a reasonably foreseeable consequence' of the [discriminatory or retaliatory conduct]." *Delph [v. Dr. Pepper Bottling Co. of Paragould, Inc.]*, 130 F.3d [349,] 354 [ (8th Cir. 1997) ] (quoting *Hukkanen*, 3 F.3d at 285); *Gartman*, 120 F.3d at 130 (also citing *Hukkanen* ). Finally, "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly"; therefore, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir.1995).

*Cherry,* 101 F.Supp.2d at 1187–88.

■ The court will not rehash its discussion made on John Morrell's motion for summary judgment, but it suffices to say that Baker presented sufficient evidence to show that the actions she was subjected to after returning from her December of 1999 discharge were adverse actions. While retaliatory conduct must be " 'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or][c]hanges in duties or working conditions that cause no materially significant disadvantage[,]" *Kim v. Nash Finch, Co.*, 123 F.3d 1046, 1060 (8th Cir.1997) (some internal quotations and citations omitted) (citing *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994), *Thomas v. St. Luke's Health Sys., Inc.*, 869 F.Supp. 1413, 1435 (N.D.Iowa 1994), *aff'd*, 61 F.3d 908 (8th Cir.1995) (table) (No. 94–4081)), taken together, the addition of job duties, disparate refusal to provide assistance, and denial of breaks adversely and materially affected Baker's employment as a scale operator. *See Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir. 1992) (courts look at combined effect of employer's actions to determine if there was discrimination).

John Morrell argues that the evidence showed that Brown–Rowley relieved Baker of added job duties when Baker complained that they were too difficult and that Brown–Rowley allowed Baker to take needed restroom breaks. However, John Morrell's argument can only prevail by asking the court to make credibility determinations—and, again, the court cannot make such determinations on this motion for judgment as a matter of law. *See Troknya,* 280 F.3d at 1206.

There was sufficient evidence for a reasonable jury to conclude that Brown–Rowley subjected Baker to adverse employment actions after Baker filed her charge of discrimination, and the court will not set aside the jury's finding based solely on John Morrell's witnesses' self-interested, contradictory testimony. The jury could not have believed Baker's testimony without drawing adverse conclusions about the credibility of John Morrell's witnesses, and the jury apparently chose to accept Baker's account and to reject Brown–Rowley's denials. John Morrell's disagreement with that choice does not justify disturbing the verdict. *See Reeves,* 530 U.S. at 135, 120 S.Ct. 2097 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

***ii. Causal connection.*** John Morrell further contends that, even if the court finds that Brown–Rowley did subject Baker to the alleged adverse employment actions by way of increased job duties and denial of production line assistance, the evidence does not support a finding of a causal connection between Baker's harassment complaints and John Morrell's assignment of increased job duties.[8] Here, Baker alleges, *inter alia,* that when she returned to John Morrell in February of 2000 after being reinstated, Brown–Rowley retaliated against her.

■ The third and final element of a retaliation claim requires a showing that the adverse action was causally linked to the protected conduct. *See Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997); *Evans v. Kansas City, Mo. Sch. Dist.,* 65 F.3d 98, 100 (8th Cir.1995). "Generally, more than a temporal connec-

tion between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999) (en banc). John Morrell argues that Baker presented no evidence of conduct or statements apart from temporal proximity that would permit a reasonable jury to find that Brown–Rowley actually increased her job duties or refused her assistance because she voiced opposition to harassment and filed a charge of discrimination.

■ The court disagrees with John Morrell's characterization of the evidence. Indeed, Baker's evidence of temporal proximity is compelling. However, her evidence consisted of substantially more than mere timing. She not only presented evidence of temporal proximity, the jury also heard evidence of statements by Brown–Rowley that Brown–Rowley was "sick of [Baker's] shit"; that she was upset Baker "dragged her into this mess" and that Baker should stop reporting harassment to Joyce because he was tired of hearing Baker complain. In addition, she testified that her relationship with Brown–Rowley and with Joyce changed after she filed her discrimination charge. In short, this is not a case like *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999) (en banc), or *Nelson v. J.C. Penney Co.,* 75 F.3d 343, 346 (8th Cir.1996), where the plaintiffs' sole evidence of causation was temporal proximity.

As noted, the final element in the *prima facie* case of retaliation is that the adverse action was causally linked to plaintiff's protected activity. The facts of *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241 (8th Cir.1998) are instructive on this point. In *Coffman,* the Court of Appeals for the Eighth Circuit upheld the jury's verdict on the Title VII plaintiff's retaliatory con-

---

**8.** John Morrell notably did not argue that, even if the court found that Brown–Rowley denied Baker bathroom breaks, Baker still failed to prove a causal connection.

structive discharge claim. The court determined that the plaintiff presented sufficient evidence to support a finding of a causal connection between the plaintiff's protected activity and constructive discharge. The court reasoned that the following evidence supported an inference of causation:

> The person making the adverse employment decisions, Beckler, was the same person whose behavior had been the subject of Coffman's harassment complaint. There was evidence that Beckler's demeanor and his relationship with Coffman changed after the complaint. His exaggerated reactions to Coffman in the hallway support an inference of hostility towards Coffman in response to her complaint. This evidence could well have been used by the jury to draw an inference that Beckler's actions in changing Coffman's duties and denying her vacation time had been taken in response to the complaint. The timing of Beckler's actions in relation to the harassment complaint, when considered along with the other evidence of retaliatory motive, also supports a reasonable inference that his actions were motivated by the complaint. *See O'Bryan v. KTIV Television*, 64 F.3d 1188, 1194–95 (8th Cir.1995). Finally, the jury easily could have disbelieved Tracker Marine's proffered legitimate reasons for the actions and found they were pretextual.

*Coffman*, 141 F.3d at 1246.

Similarly, in this case, although Brown–Rowley was not initially the target of Baker's harassment complaint, Brown–Rowley's behavior toward her changed suddenly and drastically after Baker made the formal complaint and after Brown–Rowley was required to testify before the Sioux City Human Rights Commission. Baker later reported Brown–Rowley's retaliatory behavior to Joyce, who spoke to Brown–Rowley about the complained-of incidents. Brown–Rowley admitted to the substance of her conduct, but Joyce did not investigate further nor seek to determine the motivation for her maltreatment of Baker. In addition, the *McDonnell Douglas* burden-shifting paradigm allows the defendant an opportunity to rebut the inference of discriminatory intent that arises with the establishment of a *prima facie* case, but John Morrell did not attempt to offer a legitimate, nondiscriminatory reason for Brown–Rowley's conduct. Instead, John Morrell denied the other alleged retaliatory actions by Brown–Rowley and denied that those that did occur were retaliatory. In sum, John Morrell offered no explanations for the actions, and a jury could reasonably have found Baker's allegations to be credible and the result of unlawful retaliation.

In conclusion, the jury heard, and was entitled to credit, evidence that Brown–Rowley subjected to Baker to adverse employment actions that were the result of Baker's opposition to harassment and her filing a discrimination charge. Therefore, the court denies John Morrell's motion for judgment as a matter of law on this issue.

### b. *Allowing the harassment to continue*

Baker also alleged that John Morrell permitted Eichmann and Murphy to continue harassing her in retaliation for Baker's opposition to harassment. On this motion, John Morrell argues that there was no evidence that it failed to adequately respond to Baker's complaints of harassment and permitted it to continue.[9] The

---

**9.** John Morrell did not frame its argument in such a manner that would alert the court to any contention that its purported prompt and appropriate remedial response isolated John

Morrell from liability on Baker's retaliation claim. The Eighth Circuit has not answered the question of whether such action prevents

court, once again, disagrees with John Morrell's characterization of the evidence. As noted earlier, Baker testified that, after she filed a charge of discrimination, Brown–Rowley was less receptive to Baker's complaints about Eichmann and Murphy and that she discouraged Baker from reporting harassment to Joyce. By discouraging her from reporting harassment and by telling Baker to "shut the fuck up" and that she was "sick" of Baker's "shit" because Brown–Rowley was angry about being "dragged into" Baker's case, a jury could reasonably conclude that Brown–Rowley intentionally permitted harassment to continue by failing to respond to Baker's complaints in retaliation for Baker's opposition to harassment. John Morrell, therefore, is likewise not entitled to judgment as a matter of law based on this argument, either.

### 4. Sufficiency of the evidence—constructive discharge

Baker left John Morrell in March of 2000, and—after several months of sick leave—formally resigned in February of 2001. She claimed that she was forced to leave in order to escape intolerable working conditions. John Morrell argues that the evidence is insufficient to support the jury's finding that Baker had been constructively discharged. Constructive discharge is not a cause of action in and of itself. The theory is merely a mechanism that allows a plaintiff to avoid the requirement of showing that she did not leave her job voluntarily. Nevertheless, given its importance to Baker's claims, the court will address it separately. Whether Baker was constructively discharged is relevant

to her sexual harassment claim because it entitles her to an award of backpay and is relevant to her retaliation claim because it can constitute the requisite adverse employment action.[10]

 "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996). An objective standard governs the determination of whether the working conditions were intolerable. *E.g., Jackson v. Arkansas Dept. of Educ., Vocational and Technical Educ. Div.,* 272 F.3d 1020, 1026–27 (8th Cir.2001) ("[T]he employee must also show that a reasonable person, from an objective viewpoint, would find the working conditions intolerable.") (citing *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir.1998); *Allen v. Bridgestone/Firestone, Inc.,* 81 F.3d 793, 796 (8th Cir.1996)). "An employee may not be unreasonably sensitive to [her] working environment. A constructive discharge arises only when a reasonable person would find [her working] conditions intolerable." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981). Standing alone, violations of Title VII do not prove that a plaintiff was constructively discharged. *See Coffman,* 141 F.3d at 1247 (citing *Tidwell,* 93 F.3d at 495). It is for that reason that the court must still address John Morrell's contention that Baker failed to establish her constructive discharge claim despite having already found that Baker was subjected to a hostile work environment and was the target

---

employer liability for a retaliation claim. *Coffman,* 141 F.3d at 1246 n. 3. However, in light of the fact John Morrell did not argue it and in light of the jury's finding that John Morrell did not take prompt and adequate remedial action, the court need not address this nettlesome question.

**10.** A finding that Baker was constructively discharged is not necessary for Baker's retaliation claim because she presented evidence, which the jury believed, that she was subjected to other retaliatory adverse employment actions, as discussed in section II.A.3, *supra.*

of retaliatory adverse employment actions. *See id.*

■ The evidence must be sufficient to show that (1) a reasonable person in Baker's position would have found that the conditions of her employment were intolerable, *Coffman,* 141 F.3d at 1247; and (2) John Morrell "deliberately create[d] intolerable working conditions with the intention of forcing [Baker] to quit." *Tidwell,* 93 F.3d at 494 (citing *Bunny Bread Co.,* 646 F.2d at 1256). Baker can satisfy the intent element by showing that "[she] quit as a reasonably foreseeable consequence of [John Morrell]'s discriminatory actions." *Coffman,* 141 F.3d at 1247 (quoting *Bunny Bread Co.,* 646 F.2d at 1256); *accord West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir.1995) ("An employee is constructively discharged 'when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job.' ") (quoting *Smith v. World Ins. Co.,* 38 F.3d 1456, 1460 (8th Cir.1994)). John Morrell disputes that the evidence presented at trial supports a finding on either of these elements. On this motion for judgment as a matter of law, the question before the court "is whether there was 'a complete absence of probative facts' supporting plaintiff[']s position, such that no reasonable juror could have found that [she] had been constructively discharged from [her] job[ ].' " *Hunt v. State of Missouri, Dept. of Corrections,* 297 F.3d 735, 744 (8th Cir.2002) (quoting *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1005–06 (8th Cir.2000)).

### a. *Intolerableness of working conditions*

■ John Morrell argues that Baker's working conditions were not objectively so intolerable that a reasonable person would feel compelled to quit. In support of its contention, John Morrell again mischaracterizes the evidence and asserts that, be-

cause Baker was not subjected to harassment for nine months prior to her decision to leave, she could not have felt compelled to quit. While it is true that remaining in allegedly intolerable working conditions for a significant period of time after an employee determines that she has no choice but to leave would belie a plaintiff's assertion that she subjectively felt that her working conditions were intolerable, *Wensel,* 218 F.Supp.2d at 1065, Baker's actions were not inconsistent with her subjective interpretation of her work environment. The jury heard evidence that Baker was subjected to harassment and retaliation up until she went on her last medical leave. Baker testified that Brown–Rowley discriminatorily denied her breaks and treated her more harshly after she returned to John Morrell in February of 2000. She also testified that Murphy made "hip thrusting" gesture towards her in early 2001. Moreover, after her return to John Morrell and continuing until she quit, Eichmann continued to leer at Baker in a threatening manner, which, together with his maltreatment and in light of his history of harassing Baker, constitutes harassment. *See, e.g., Hathaway v. Runyon,* 132 F.3d 1214, 1217 (8th Cir.1997) (the harasser "stared at her with a menacing look," and also was "getting physically close and making peculiar comments, telling [plaintiff] that other workers believed they were romantically involved," making "physical sexual advances," such as "he hit her on the buttocks with a clipboard," and a week later "squeezed her buttocks"; plaintiff regularly had to interrupt her work in order to avoid encountering the harasser, and "[a]fter [plaintiff] rebuffed the [harasser's] advances, he began to snicker and laugh at her, making guttural noises when she walked by him"); *Yamaguchi v. U.S. Dep't of the Air Force,* 109 F.3d 1475, 1478 (9th Cir.1997) (alleging that harasser "stare[d] at her during work" and also

made "inappropriate jokes and comments and sen[t] [plaintiff] unwanted notes, gifts and e-mail messages," attempted to kiss her, made "sexual gestures and remarks about her body, perfume, and clothing and about other women in the workplace," came to plaintiff's apartment and "allegedly tied her up, gagged her and raped her"); *Cross v. Alabama Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1495–97 (11th Cir.1995) (involved "glaring looks, piercing looks" in case with seven female plaintiffs' testifying that the harasser treated his women employees differently than men); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1461–63 (9th Cir.1994) (alleging "stares, glares, snickers, and comments," along with "habitually refer[ring] to [plaintiff] and to other female employees in a derogatory fashion using sexual explicit and offensive terms"); *cf. Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 570–74 (8th Cir.1997) (involving Brewer's "following her around the store" and also involving testimony that harassers Brewer and Mais treated their women employees differently than men).

Furthermore, Baker was a long-time employee who had complained to John Morrell on countless occasions about harassment. She was a dedicated and loyal worker making an unreciprocated effort to improve her working conditions. John Morrell argues that Baker's constructive discharge claim cannot stand on her allegation that she felt compelled to leave based on the defendant's inadequate response to the harassment because John Morrell investigated all of her complaints, disciplined the harassers, and included Baker in the disciplinary process. The court found previously, however, that John Morrell's response to Baker's complaints was not adequate but was merely superficial. She was subjected to continuous harassment for years, yet John Morrell's only action against Eichmann was a single letter of reprimand in his personnel file.

Apart from "getting their side of the story," John Morrell took no action against Murphy, Ridge, Brown–Rowley, or the several other employees who Baker reported.

In *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7 (1st Cir.2002), the plaintiff's male supervisor had subjected her to sexual harassment beginning on the first day of her employment and continuing until she resigned. *Id.* at 14. The plaintiff, Marrero, complained about the harassment to management on numerous occasions, but her employer did not take any action until she filed a formal charge. *Id.* at 16. After she filed the charge, she was transferred to a new position under a different supervisor. *Id.* However, her new position required interaction with her former supervisor/harasser, and her new desk was in close proximity to her former supervisor's office, forcing her to have regular contact with him. *Id.* In addition, her new supervisor subjected her to close scrutiny and, despite the fact that her new job involved the same duties, she was placed on probationary status. *Id.*

Marrero filed a Title VII action against her employer and, *inter alia*, alleged that she had been constructively discharged. *Id.* at 14. The parties went to trial, and the jury returned a verdict in favor of Marrero. *Id.* at 13. The employer argued that, because Marrero's retaliation claim failed as a matter of law, her constructive discharge claim was likewise unsupported by the evidence. *Id.* at 27. The First Circuit recognized that the fact Marrero had been subjected to a sexually hostile work environment was insufficient on its own to support her constructive discharge claim, but rejected the employer's contention that retaliatory action, though insufficient to survive as a separate claim, was not relevant to her constructive discharge claim. *Id.* at 28.

Pertinent to this court's consideration of Baker's assertion that her working conditions were objectively intolerable, the First Circuit reasoned:

> [T]he fact that the plaintiff endured a hostile work environment—without more—will not always support a finding of constructive discharge. *See Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."). Rather, the jury must find that the working conditions were so unpleasant that "staying on the job while seeking redress [would have been] intolerable." *Keeler v. Putnam Fid. Trust Co.*, 238 F.3d 5, 10 (1st Cir.2001). In addressing that question, however, the jury reasonably can take into account how the employer responded to the plaintiff's complaints, if any.

*Id.*

In *Marrero*, the court concluded that the plaintiff reasonably determined that remaining at work while pursuing remedies short of resignation was not a viable option. *Id.* In reaching that conclusion, the court considered the plaintiff's perception of the likelihood that the harassment would continue based on her employer's previous remedial actions. *Id.* Because Marrero had been subjected to years of continuous harassment and the inadequacy of her transfer to a different position, the court found that she "reasonably believed that her working conditions at Goya would not change and that she could only anticipate more of the same intolerable harassment. If she wanted to avoid further harm, she would have to leave work entirely." *Id.* at 29 (citing *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 200–01 (5th Cir.1992)).

The factors that the *Marrero* court identified as coloring the plaintiff's assessment of the likelihood of her working conditions improving are present in Baker's case. *See id.* Baker was subjected to years of harassment. Indeed, in *Marrero*, the plaintiff had endured a year and one-half of harassment, while Baker endured several years. The harassment present in *Marrero* was arguably more severe, but it was not as prolonged, and it was confined to one harasser. Moreover, like Marrero, Baker repeatedly complained to management about the harassment, yet management did not take any meaningful action. While it is true that there would be brief respites after Joyce talked to Baker's harassers, the harassment inevitably began anew. And lastly, when the harassment continued after filing a formal charge of discrimination, Baker reasonably concluded that, after years of trying to work with John Morrell to address her hostile work environment, her working conditions at John Morrell were not going to change and that, if she did not resign, she would have to endure being harassed. When Baker quit, she had no option but to work alongside Eichmann, Murphy, and Brown–Rowley, and Brown–Rowley discouraged her from making any further complaints to human resources. Under these circumstances, which included years of harassment, working alongside her harassers, and being told that John Morrell was "sick of her shit," Baker reasonably determined that her working conditions were not going to improve. At this point, it became clear to her that further attempts to correct her working conditions would be futile.

In order to override the jury's verdict, the court would have to find that, after drawing all reasonable inferences in favor of the verdict, the evidence is insufficient to support the jury's finding that a reasonable person in Baker's position would have felt compelled to quit. *See Duncan,* 300

F.3d at 933 (citing *Blackmon v. Pinkerton Sec. & Investigative Servs.*, 182 F.3d 629, 635 (8th Cir.1999)). Based on the totality of the circumstances, this case presents a close call, but given the years of continuous harassment and John Morrell's inadequate and superficial corrective measures, the court concludes that the jury reasonably could have found that Baker reasonably concluded that her working conditions were intolerable and that she had no choice but to resign. *See Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1008 (8th Cir. 2000) (holding if an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge); *Phillips v. Taco Bell, Corp.*, 156 F.3d 884, 890 (8th Cir. 1998) (same); *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 574–75 (8th Cir.1997) (affirming constructive discharge verdict where "[a] reasonable jury could find that the continuing harassment and management's indifference rendered [the plaintiff's] working conditions intolerable and forced her to quit") (citing *Winbush v. State of Iowa by Glenwood State Hosp.*, 66 F.3d 1471, 1485 (8th Cir.1995)); *Flockhart v. Iowa Beef Processors, Inc.*, 192 F.Supp.2d 947, 968–69 (N.D.Iowa 2001) (bench trial finding plaintiff proved constructive discharge, stating relevant to claim was "the ongoing nature of the harassment and the failure of IBP management to make any concerted efforts to address the plaintiff's concerns") (citing *Kimzey*, 107 F.3d at 574).

### b. Intentionally made working conditions intolerable

■ John Morrell also contends that Baker failed to present sufficient evidence to establish its liability for sexual discrimination by constructive discharge because she failed to prove that it deliberately created intolerable working conditions with the intention of forcing her to quit. To be liable for constructive discharge, "an employer must have intended *or at least reasonably foreseen* that the employee would quit as a result of the unlawful working conditions it created, and the employee must have given it a reasonable opportunity to fix the problem." *Jaros v. LodgeNet Entertainment Corp.*, 294 F.3d 960, 965 (8th Cir.2002) (emphasis added) (citing *Jackson v. Arkansas Dep't of Educ.*, 272 F.3d 1020, 1026–27 (8th Cir.2001), *cert. denied*, 536 U.S. 908, 122 S.Ct. 2366, 153 L.Ed.2d 186 (2002)).

■ As this court stated in *Delashmutt v. Wis–Pak Plastics, Inc.*, 990 F.Supp. 689, 703 (N.D.Iowa 1998), "[i]t is reasonably foreseeable that a person who finds all of her attempts to improve intolerable working conditions foreclosed will quit, rather than continue to suffer the intolerable conditions." John Morrell argues that the evidence shows it promptly and adequately responded to all of Baker's allegations of harassment, and, therefore, it cannot be found to have intentionally created intolerable working conditions. The court will not rehash its previous discussion regarding the inadequacy of John Morrell's response to Baker's complaints. John Morrell may have superficially responded to Baker's allegations, but it took no meaningful action. Indeed, the fact that Baker was subjected to years of continuous harassment despite her countless complaints is compelling evidence that John Morrell was indifferent to her complaints. This evidence, coupled with the fact Eichmann was only formally reprimanded once and her other harassers were never formally reprimanded, supports a finding that John Morrell's indifference to Baker's complaints amounted to an intolerable situation in which it was reasonably foreseeable that Baker would quit.

John Morrell attempts to distinguish the facts of this case from cases in which the Eighth Circuit has upheld constructive dis-

charge claims where the plaintiffs' complaints were met by indifference. Namely, John Morrell contends that *Ogden v. Wax Works, Inc.*, 214 F.3d 999 (8th Cir.2000), and *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568 (8th Cir.1997), are inapposite because John Morrell made an effort, albeit a failed one, to correct the complained-of harassment. In *Ogden*, the plaintiff, Kerry Ogden, managed a record store in Sioux City, Iowa. *Ogden*, 214 F.3d at 1002–03. She reported to a district manager, Robert Hudson. *Id.* at 1003. Hudson began sexually harassing Ogden shortly after she began working at the music store. *Id.* Ogden complained about the harassment to the regional manager, Jeff Klem. *Id.* However, the defendant's response was, at best, minimal. Klem spoke to Hudson, but Hudson assured Klem that Ogden and he merely had a personality conflict. *Id.* at 1004.[11] Klem also visited Ogden's Sioux City store and interviewed employees who witnessed the harassment. *Id.* at 1004–05. According to those employees, Klem focused on Ogden's performance during these interviews, rather than on Hudson's conduct. *Id.* at 1005. Because she was ill when Klem visited her store, Ogden was unable to meet with him personally, but she made several unsuccessful attempts to contact him while he was at the store. *Id.* When she finally got in touch with Klem, he told her that Hudson was an asset to the company, and, when Ogden asked whether she could continue to work for Hudson in the wake of her allegations, Klem replied, "No." *Id.* Ogden interpreted this conversation to mean she could no longer work for the defendant because it valued Hudson's services more than hers. *Id.*

Ogden filed a complaint in federal court, alleging Title VII violations. *Id.* The case went to trial, and the jury returned a verdict in favor of Ogden. *Id.* at 1002. Pertinent to Baker's case, the jury found that Ogden had been constructively discharged and awarded her backpay. *Id.* The defendant moved for judgment as a matter of law, arguing, *inter alia*, that there was insufficient evidence to support Ogden's constructive discharge. *Id.* at 1007–08. The district court and the Court of Appeals for the Eighth Circuit disagreed. *Id.* at 1008. Given the defendant's response to Ogden's complaints, the *Ogden* court held that a reasonable jury could have concluded that Ogden quit because she reasonably believed she had no chance for fair treatment. *Id.*

John Morrell attempts to distinguish its response to Baker's complaints from the *Ogden* defendant's response by arguing that John Morrell conducted thorough investigations of Baker's complaints, disciplined her harassers, and included Baker in the investigatory process. While John Morrell did look into many of Baker's complaints, the evidence does not suggest John Morrell thoroughly investigated them. Indeed, like Ogden's employer, at every turn John Morrell determined that Baker, Eichmann, and Murphy simply had personality conflicts. Far from disciplining Eichmann, Murphy, and others, Joyce urged them to get along. Furthermore, Joyce merely asked Brown–Rowley about Baker's allegations toward her. Because Baker's and Brown–Rowley's versions of the complained-of incident differed, Joyce determined there was insufficient corroboration of Baker's allegations and did not discipline Brown–Rowley nor contact Baker about his decision not to pursue her complaint further.

Indeed, Joyce was unequivocal on the stand when at trial he testified that he never considered Baker's complaints to be

---

**11.** Interestingly, John Morrell argues that, based on its investigations of Baker's complaints, Baker and Eichmann similarly merely have a "personality conflict."

allegations of sexual harassment. Accordingly, he did not respond to her complaints as anything more than personality clashes on the cut floor of the plant. Given the lewd language and conduct Baker reported, the court is hard-pressed to understand why Baker's complaints did not raise sexual harassment "red flags." Furthermore, after Baker filed her discrimination charge, she asked that John Morrell's "sexual harassment is illegal" poster be distributed to Eichmann and Murphy, but John Morrell did not give them the poster, nor did it provide Eichmann or Murphy with any sexual harassment training.

The evidence established that Baker did not want to leave John Morrell and that she enjoyed her job there. She made every effort possible to remedy her work environment, but when Brown–Rowley told Baker not to complain to Joyce anymore, it became abundantly clear to Baker that she would not receive fair treatment at John Morrell. After years of failing to take adequate corrective measures to innumerable complaints, a reasonable jury could have found that it was reasonably foreseeable to John Morrell that its continued inaction would lead Baker to quit, having concluded that her only alternative to resignation was to endure continued harassment. John Morrell's inadequate and superficial response to Baker's complaints makes application of the *Ogden* court's reasoning strikingly appropriate to this case and warrants the same finding— specifically, that Baker presented sufficient evidence to support her constructive discharge claim because it was reasonably foreseeable to John Morrell that its response would lead Baker to conclude she had no chance for fair treatment.

Application of the *Kimzey* court's reasoning compels the same result. In *Kimzey*, the plaintiff worked at Wal–Mart and was subjected to ongoing harassment from the time she began working at Wal–Mart until she quit. *Kimzey*, 107 F.3d at 570. She made several complaints to management about the harassment, but management did not take any meaningful action against her harassers, nor did it keep a record of her allegations. *Id.* at 572–73. Kimzey ultimately quit her job and sued Wal–Mart under Title VII. *Id.* at 570. After the jury returned a verdict in her favor and after the district court denied Wal–Mart's motion for judgment as a matter of law, Wal–Mart appealed. *Id.*

On appeal, Wal–Mart argued that Kimzey failed to prove she was constructively discharged. *Id.* at 574. The Court of Appeals for the Eighth Circuit rejected Wal–Mart's argument and held that management's knowledge of the harassment, the frequency of her complaints, and Wal–Mart's failure to act on that knowledge and on her complaints rendered Kimzey's working conditions intolerable. *Id.* This is so because Wal–Mart's indifference to her complaints was increasingly upsetting to Kimzey. *Id.*

The same is true in Baker's case. She complained to management for years about Eichmann's conduct, yet instead of implementing corrective measures or disciplining Eichmann or Murphy, she was told she and Eichmann had a "hard on" for each other and was discouraged from making complaints because Joyce was "sick of her shit." Baker was clearly upset by John Morrell's treatment of her and what she perceived to be indifference and frustration with her frequent complaints. While all of Baker's testimony was evincive and emotionally charged, it was apparent that one of the things that upset Baker most was when, after Brown–Rowley's comment that Joyce did not want to hear any more complaints from Baker, she reasonably determined that Joyce was not going to help her remedy the situation. Brown–Rowley's discouragement from lodging further com-

plaints, coupled with the years of unremedied harassment in the face of numerous complaints, amounted to a situation in which it was reasonably foreseeable that Baker would find all of her attempts to improve her intolerable working conditions foreclosed and would quit, rather than continue to suffer the intolerable conditions. *See id.* Therefore, Baker produced sufficient evidence to satisfy the second prong of her constructive discharge claim, and John Morrell is not entitled to judgment as a matter of law.

Having concluded that Baker presented sufficient evidence that, when viewed in the light most favorable to her and drawing all reasonable inferences in her favor, supports each of the claims on which she prevailed at trial, the court denies John Morrell's motion for judgment as a matter of law and turns next to its motion for new trial.

## B. *Defendant's Motion for New Trial*

### 1. *Applicable standards*

Federal Rule of Civil Procedure 59, entitled "New Trials; Amendment of Judgments," states, in relevant part, as follows: "A new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts in the United States...." FED. R. CIV. P. 59(a). While the court will discuss the applicable standards in some greater detail when relevant, the majority of John Morrell's objection on this Rule 59 motion center on evidentiary rulings. Therefore, pertinent to those objections, the governing standard is whether the allegedly erroneous evidentiary ruling "was so prejudicial that a new trial would likely produce a different result." *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 612 (8th Cir.1997).

John Morrell moved for a new trial on five discrete grounds. First, John Mor-

rell contends that the court erroneously admitted the testimony of four current and former female John Morrell employees. Second, it contends that the court's jury instructions were improper in that they contained specific allegations, the inclusion of which John Morrell argues was highly prejudicial. Third, John Morrell asserts that the court erroneously permitted the admission of evidence concerning a rumor allegedly spread by Murphy about his relationship with Baker. Fourth, John Morrell believes that the court erred in permitting Baker's treating physician to testify concerning the substance and causation of Baker's emotional distress. And finally, John Morrell contends that a comment made by plaintiff's counsel during his closing argument was extremely prejudicial and warrants a new trial.

### 2. *Was the testimony of other John Morrell female employees so unfairly prejudicial that a new trial is warranted?*

In support of its motion for new trial on the ground that admission of the testimony of Gloria Windle, Kay Nilson, Debra Canady, and Georgia Risley was unduly prejudicial, distracting, and irrelevant, John Morrell re-asserts the same arguments it asserted in its second motion *in limine,* which sought to exclude the testimony of Windle and Canady. The court previously examined these arguments and refused to exclude the plaintiff's witnesses' testimony, rejecting the defendant's Federal Rules of Evidence 402 and 403 arguments. The court will, however, re-examine its previous conclusion in light of the testimony actually presented at trial.

"An allegedly erroneous evidentiary ruling does not warrant a new trial 'unless the evidence was so prejudicial that a new trial would likely produce a different re-

sult.'" *Harrison v. Purdy Bros. Trucking Co.,* 312 F.3d 346, 351 (8th Cir.2002) (quoting *Bevan,* 118 F.3d at 612). While John Morrell does not argue that exclusion of the four witnesses' testimony would likely result in a verdict in favor of the defendant, it does argue that the admission of those witnesses' testimony had no bearing on the merits of Baker's case and impassioned and prejudiced the jury against the defendant. In support of its argument, it cites *Silbergleit v. First Interstate Bank of Fargo, N.A.,* 37 F.3d 394 (8th Cir.1994). In *Silbergleit,* the Court of Appeals for the Eighth Circuit reversed the trial court's denial of the plaintiff's motion for judgment notwithstanding the verdict or a new trial because counsel for the defendant inquired about three irrelevant and prejudicial subjects. *Id.* at 395. Namely, counsel posited questions to witnesses involving the plaintiff's wealth, his receipt of unemployment compensation benefits, and his religion. *Id.* at 395–97. With regard to the plaintiff's wealth, the trial judge sustained the plaintiff's objection to the defendant's question, "Are you suggesting to me that you are not a millionaire?" *Id.* at 395. After sustaining the objection, the trial judge instructed the jury that the plaintiff's wealth was not relevant. *Id.* However, counsel for the defendant later elicited similar testimony about the plaintiff's assets from another witness. *Id.* at 396. The trial judge agreed that the questions were irrelevant and prejudicial but denied the plaintiff's motion for new trial, finding that the statements were not sufficiently prejudicial, especially in light of the court's curative instruction directing the jury to disregard the plaintiff's wealth. *Id.*

The second irrelevant and improper matter that defense counsel inquired about was the plaintiff's receipt of unemployment compensation benefits. *Id.* Despite the fact that the court ruled that the benefits were not deducible from the plaintiff's damages and, therefore, were irrelevant, the court permitted counsel to question the plaintiff about unemployment benefits to show the plaintiff's failure to mitigate his damages by finding another job. *Id.* And third, defendant's counsel repeatedly referred to the plaintiff's religion and, in addition, tried to impeach another witness by implying the witness was anti-Semitic. *Id.*

The plaintiff appealed the trial court's denial of his post-trial motions, and the Eighth Circuit reversed. The issue before the *Silbergleit* court was whether questions by counsel that placed prejudicial information before the jury warranted a new trial. *Id.* at 397. In this case, the court ruled that "the mix of religion, wealth and receipt of unemployment benefits presented a powerful combination of irrelevant evidence having no bearing on the merits of the case, that were designed to impassion and prejudice the jury against [the plaintiff]." *Id.* In the context of the entire trial, the court determined that the trial court abused its discretion in denying the plaintiff's new trial motion, and the court remanded the case for a new trial. *Id.*

■■■ Here, John Morrell contends that the four female employees' testimony impassioned and prejudiced the jury against the defendant. The court is hard-pressed to find how the *Silbergleit* decision is instructive in this case because the issue in *Silbergleit* was whether irrelevant and prejudicial information put before the jury through counsel's questions in a deliberate attempt to villainize the plaintiff warranted a new trial. Here, the evidence to which John Morrell objects was relevant and was not a tactical decision made by the plaintiff's lawyer to make an end-run around any of the court's rulings, as was the situation in *Silbergleit.* John Morrell acknowledges that the testimony of Windle, Canady, Nilson, and Risley was presented in an

attempt to prove an atmosphere of harassment in the plant but denies that an atmosphere of harassment is relevant.

As explained about in the court's consideration of the defendant's judgment as a matter of law, the plant-wide atmosphere at John Morrell was relevant to Baker's hostile work environment claim. *See, e.g., Estes,* 231 F.Supp.2d at 281–82 (evidence of "locker-room" atmosphere relevant to show harassment was sufficiently pervasive); *accord Madison v. IBP, Inc.,* 257 F.3d 780, 793–94 (8th Cir.2001) (evidence of other victims of discrimination and harassment in workplace relevant to show whether employer maintained a hostile work environment), *vacated and remanded on different grounds,* 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002). Thus, unlike in *Siblergleit* where the improper questions opened the windows on completely irrelevant facts, the four objected-to witnesses' testimony was relevant to Baker's claim to show the atmosphere at John Morrell, which inextricably colored Baker's assessment of both her work environment and John Morrell's response to her complaints. It is necessary to " 'look[ ] at all the circumstances' " in order to determine whether the environment was hostile or abusive. *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367); *see also Hathaway,* 132 F.3d at 1222. All evidence concerning the abusiveness of a plaintiff's working conditions is relevant to this inquiry, *see Harris,* 510 U.S. at 23, 114 S.Ct. 367, and the testimony presented from the four witnesses falls into this cate-gory.[12] And while the court agrees that an atmosphere of harassment alone will not support Title VII liability, *Woodland,* 302 F.3d at 843–44, Baker presented ample evidence that she was personally subjected to severe and pervasive harassment. The court eliminated unduly prejudicial, confusing, and extraneous testimony in its ruling on the defendant's second motion *in limine* by limiting the witnesses' testimony to incidents of sexual harassment.[13]

In order to be admissible, evidence must be relevant. FED. R. EVID. 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." FED. R. EVID. 401. Here, the four witnesses' testimony was relevant because it tended to prove John Morrell's knowledge and notice of harassment, its intent to discriminate, whether it maintained a sexually hostile workplace, and to show Baker's assessment of John Morrell's response to her complaints and background evidence of her hostile work environment claim. *See Madison,* 257 F.3d at 793–94.

Under Rule 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial court has wide discretion in making this determination under Rule 403. *United States v. Ford,* 17 F.3d 1100, 1103 (8th

---

12. Moreover, the testimony of Nilson and Riley was clearly relevant because they testified regarding confrontations with and harassment from Eichmann and regarding John Morrell's response to their complaints. In addition, John Morrell itself recognized the relevancy of Windle's and Canady's testimony in its brief in support of its second motion *in limine* but argued that its probative value was outweighed by the risk of prejudice and confusion. (Doc. No. 89, at 2–3).

13. Canady and Windle also filed lawsuits against John Morrell alleging both race and sex discrimination. In its ruling on the defendant's second motion *in limine,* the court limited their testimony to sexual harassment allegations.

Cir.1994). The court has reviewed the testimony of Windle, Nilson, Canady, and Risley and concludes that its probative value was not substantially outweighed by unfair prejudice, nor did it confuse the jury. Therefore, admission of their testimony does not warrant a new trial. Moreover, these witnesses' testimony was relatively innocuous and was subjected to rigorous cross-examination by defense counsel. Under these circumstances, assuming *arguendo* that their testimony was improperly admitted, John Morrell has not shown that " 'the evidence was so prejudicial that a new trial would likely produce a different result.' " *See Harrison*, 312 F.3d at 351 (quoting *Bevan*, 118 F.3d at 612).

### 3. Specific allegations of harassment in jury instructions

On the morning of Monday, September 30, 2002, the court held an instruction conference in order to allow the parties to lodge any objections they might have to the court's proposed final instructions. John Morrell had copies of the Proposed Final Instructions as early as September 18, 2002, which was five days prior to the start of trial. The court ordered the parties to file any objections to the proposed instructions by September 20, 2002. With respect to Proposed Final Instruction No. 3, the defendant requested additional language and did not suggest that the allegations be omitted. Subject to the change that resulted from the presentation of evidence at trial, the unobjected-to Proposed Final Instruction No. 3 was identical to Final Instruction No. 3.

During trial, the court held another instruction conference. Despite the fact John Morrell objected to several portions of Final Instruction No. 3, it did not object to the inclusion of Baker's specific allegations—it quibbled only about the wording of the instruction.[14] In spite of its failure to object, John Morrell now moves for a new trial on the ground that inclusion of Baker's allegations in Final Instruction No. 3 was unfairly prejudicial and gave an "air of truth" to the allegations.

 Rule 51 of the Federal Rules of Civil Procedure " 'does not require formality, and it is not important in what form an objection is made or even that a formal objection is made at all, as long as it is clear that the trial judge understood the party's position; the purpose of the rule is to inform the trial judge of possible errors so that he [or she] may have an opportunity to correct them.' " *Brown v. Sandals Resorts Internat'l*, 284 F.3d 949, 953 n. 6 (8th Cir.2002) (quoting *Meitz v. Garrison*, 413 F.2d 895, 899 (8th Cir.1969) (citation omitted)). This court strives to value substance over formalities, but in this case, John Morrell utterly failed to bring its position before the court. John Morrell waived the opportunity to assert error in Final Jury Instruction No. 3 because it did not advise the court of its objections. John Morrell niggled about the language of Final Instruction No. 3 but never objected to the inclusion of Baker's allegations. Indeed, the court made substantial changes to the wording of Final Instruction No. 3 based on John Morrell's objections.

**14.** In its brief in support of its motion for new trial, John Morrell states: "At trial, the Court, in Final Instruction No. 3, instructed the jury (*over Defendant's objection*) on Plaintiff's claims of sexual harassment and included along therewith a restatement of the specific allegations of harassment in the Court's instructions" [Deft.'s New Trial Br., at 4] (em-

phasis added). The court takes exception to John Morrell's misleading statement of the substance of its objection. At no time did John Morrell object to the inclusion of Baker's allegations so long as the allegations were supported by the evidence. [Tr., at 1118–1138; Doc. No. 100].

Rule 51 requires that litigants raise any objections to jury instructions in a timely manner in order to "afford the trial court an opportunity to cure a defective instruction and to prevent litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." *Doyne v. Union Electric Co.*, 953 F.2d 447, 450 (8th Cir.1992) (internal quotations and citations omitted). Because John Morrell failed to object, the review of this issue is limited to the plain error standard of review. *See* FED. R. CIV. P. 51 ("No party may assign as error the giving [of] an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); *Caviness v. Nucor–Yamato Steel Co.*, 105 F.3d 1216, 1220 (8th Cir.1997) (" 'In order to properly preserve a claim of instructional error for appellate review, a party is not only required to make a sufficiently precise objection before the district court, but it must also propose an alternate instruction.' ") (quoting *Kehoe v. Anheuser–Busch, Inc.*, 96 F.3d 1095, 1104 (8th Cir.1996)); *Phillips v. Parke, Davis & Co.*, 869 F.2d 407, 409 (8th Cir.1989) ("Rule 51 makes it incumbent upon the attorneys in a civil case to ascertain how the jury is to be instructed and to state any objections before the jury retires."). Plain error review is "narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Des Moines Bd. of Water Works Trs. v. Alvord, Burdick & Howson*, 706 F.2d 820, 824 (8th Cir.1983). The verdict should be reversed " 'only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected.' " *Rush v. Smith*, 56 F.3d 918, 922 (8th Cir.1995).

John Morrell's contention borders on frivolous and does not warrant a new trial. The allegations were clearly framed as allegations and were not improper. *See Caviness*, 105 F.3d at 1225 (Bright, J., concurring) ("The allegations may be mentioned either in the introduction to the jury instructions or in the verdict director.") (citing *Gillming v. Simmons Indus.*, 91 F.3d 1168, 1171 (8th Cir.1996)).

### 4. Admission of rumor evidence

In its first motion *in limine*, John Morrell moved to exclude evidence that Murphy spread a rumor regarding a sexual relationship between himself and Baker. Plaintiff's counsel proffered two theories on which to admit the evidence. First, he stated that the plaintiff intended to call Carl Cohen, a John Morrell employee. Cohen was going to testify that he heard the rumor from Murphy. However, Baker did not call Cohen to testify. Had he been called, the rumor evidence would not have been subject to the rule against hearsay because it was not offered to prove that Murphy and Baker indeed had a relationship but rather to show the source of the rumor. Second, the plaintiff contends that the rumor evidence was properly admitted because Baker confronted Murphy about the allegations and, instead of denying them, Murphy simply laughed. The plaintiff asserts that his laughter amounts to an adoptive admission, pursuant to Federal Rule of Evidence 801(d)(2)(B).

While Baker testified that she heard a rumor about her and Murphy, her belief that Murphy spread the rumor came in at trial through *John Morrell's direct examination of Murphy.* [Tr. at 1056–59]. John Morrell, not Baker, elicited the hearsay portion of the out-of-court statement. Furthermore, counsel for John Morrell withdrew his objection to inclusion of this allegation in Final Instruction No. 3 because there was sufficient evidence in the record to support Baker's allegation that Murphy conveyed a rumor about her. [Tr.

at 1124–25]. Although it is the court's opinion that John Morrell waived any objection it otherwise may have had to admission of this statement, any error in its admission was harmless in light of the abundant evidence of harassment presented at trial. Therefore, a new trial is not warranted because John Morrell has failed to carry its burden of showing that any erroneous admission of this rumor evidence substantially prejudiced its right to a fair trial. *Harrison,* 312 F.3d at 351 ("An allegedly erroneous evidentiary ruling does not warrant a new trial 'unless the evidence was so prejudicial that a new trial would likely produce a different result.' ") (quoting *Bevan,* 118 F.3d at 612); *Hall v. Arthur,* 141 F.3d 844, 849 (8th Cir.1998) ("[R]eversal of the trial court's judgment will be warranted only if the trial court committed an error that is not harmless, and an error will be considered harmless unless it affects a substantial right of the objecting party.") (citing *Crane v. Crest Tankers, Inc.,* 47 F.3d 292, 296 (8th Cir.1995); *see also* 28 U.S.C. § 2111); *Crest Tankers,* 47 F.3d at 296 ("[T]he mere fact that error was committed by admitting the exhibit does not mandate reversal. An error, in order to be reversible, must affect a substantial right of the objecting party, and the burden of showing prejudice rests on that party.") (citing *Tyler v. White,* 811 F.2d 1204, 1207 (8th Cir.1987)).

### 5. *Admission of Dr. Jennings's testimony*

As its fourth ground for a new trial, John Morrell contends that the court erred in admitting the testimony of Baker's treating physician, Dr. Jennings, as to the substance and causation of her emotional distress. John Morrell argues that Dr. Jennings's testimony was unreliable and inadmissible under Federal Rule of Evidence 702.

Expert testimony must be reliable and help the jury understand the evidence or decide a fact in issue. FED. R. EVID. 702; *Miles v. General Motors Corp.,* 262 F.3d 720, 724 (8th Cir.2001). Here, John Morrell premises its contention that admission of Dr. Jennings's testimony was improper on the lack of a sufficient foundation for his conclusion that Baker's emotional distress was caused by her experience working at John Morrell. Under Rule 702, the trial judge has a gatekeeping obligation to " 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). As the Eighth Circuit recently explained:

> "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in crossexamination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929–30 (8th Cir.2001) (quoting *Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir.1995) (internal citations and quotations omitted)).

*Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061 (8th Cir.2002); *accord Wood v. Minnesota Min. & Mfg. Co.,* 112 F.3d 306, 309 (8th Cir.1997) (same). Moreover, "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Miles,* 262 F.3d at 724.

Here, Dr. Jennings's testimony was not so lacking in foundation or reliability that it should have been excluded. Dr.

Jennings was Baker's treating physician, and he diagnosed her with depression and referred her to a psychiatrist, Dr. Muller. Dr. Muller confirmed Dr. Jennings's diagnosis. Dr. Jennings was competent to render an opinion formed during his treatment of Baker as to the causation of her depression. The sufficiency of the factual basis of Dr. Jennings's testimony was open to any challenge John Morrell desired to mount on cross-examination, but that sufficiency was not a basis for excluding Dr. Jennings's testimony altogether. *See United States v. Dico, Inc.*, 266 F.3d 864, 871 (8th Cir.2001), *cert. denied*, 535 U.S. 1095, 122 S.Ct. 2291, 152 L.Ed.2d 1050 (2002), (citing *Hose*, 70 F.3d at 974) (stating that sufficiency of factual basis of expert testimony goes to credibility, not admissibility, unless expert's opinion "is 'so fundamentally unsupported that it can offer no assistance to the jury' ") (quoting *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir.1988)). A new trial, therefore, is not warranted on the basis of the admission of Dr. Jennings's testimony.

### 6. Statements made during plaintiff's closing argument

 John Morrell's final argument on this motion for new trial is that certain statements made by plaintiff's counsel during his closing argument were extremely prejudicial. Namely, plaintiff's counsel referenced the harassment that Baker endured as "terrorist acts," which John Morrell contends were likely to insight anger, hostility, and bias against the defendant in light of the tragic events of September 11, 2001.[15] "To constitute reversible error, statements made in closing argument must be plainly unwarranted and clearly injurious." *Pearce v. Cornerstone Clinic for Women*, 938 F.2d 855, 859 (8th Cir.1991) (citing *Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 405 (8th Cir.1989)); *accord Stemmons v. Missouri Dept. of Corrections*, 82 F.3d 817, 821 (8th Cir.1996) ("We have held that 'to constitute reversible error, statements made in closing arguments must be plainly unwarranted and clearly injurious.' ") (quoting *Griffin v. Hilke*, 804 F.2d 1052, 1057 (8th Cir.1986)). "A party

15. Plaintiff's counsel made three comments that John Morrell argues warrant a new trial. Viewed within the contexts in which they were made, the comments are not as shocking as they may appear at first blush. The statements include:

I have tried to think of a good way of explaining the very problem with [the harassment] starting and stopping, and the problem with it starting and stopping is this: It's terrorism. It's guerilla warfare. Jeff Eichmann is a smart guy, and he knew how to play the personnel department like a fiddle. He knew the penchant that John Morrell had for—if *you could get one man* saying one thing and another woman saying another, nothing would be done. As Kathi Brown said, it would be treated neutrally. They would do nothing about it. [Tr. at 1635].

If you are in the position of that woman who is being harassed, who's being terrorized, who's being told that somebody's going to kill your mother or making jokes about your friend who's dead or joking about your dead dog and you make an accusation and you know that all that's going to happen is that that person is going to make accusations back at you, eventually all that happens is you stop complaining. And when you stop complaining, they have won.... And so all those gaps you see where nothing is happening is Mr. Eichmann in his terrorist way kind of hanging out in the bushes waiting until it's safe again to come back out and harass these women, in this case Rita Baker. He is playing their system, and he's playing it like a fiddle. [Tr. at 1636].

Allowing terrorism tactics to go on constantly, never solving the problem, is not acting reasonably. They should have done something years ago to stop Mr. Eichmann from treating women like he treated Rita Baker. [Tr. at 1647].

seeking reversal in circumstances like the present ones must make a 'concrete showing' that he or she was prejudiced by the objectionable statement." *Stemmons*, 82 F.3d at 821–22 (citing *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1149 (8th Cir. 1984)). Moreover, here, counsel for defendant did not object to these statements at trial. This failure to object results in application of the plain error standard of review. *Manning v. Lunda Constr. Co.*, 953 F.2d 1090, 1093 (8th Cir.1992) (per curiam); *accord Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128–29 (11th Cir.1993) (finding that improper, but unobjected-to, closing argument in a civil case may be reviewed by appellate court only for plain error). "To merit reversal [under this standard], the error must have 'resulted in a miscarriage of justice or seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Smith v. Kmart Corp.*, 177 F.3d 19, 26 (1st Cir.1999) (quoting *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 189 (1st Cir.1996)).

 In light of the substantial evidence of sexual harassment presented at trial, John Morrell faces an uphill battle in attempting to show prejudice because, on this record, the court is confident that a verdict in favor of the plaintiff was almost inevitable. Plaintiff's counsel's remarks were, at minimum, imprudent, but it is highly unlikely that they affected the verdict. In *Stemmons v. Missouri Department of Corrections*, 82 F.3d 817 (8th Cir. 1996), the Eighth Circuit affirmed the district court's denial of a motion for new trial, rejecting the defendant's argument that plaintiff's counsel made an objected-to improper comment during his closing argument. More specifically, counsel stated " 'You know, ladies and gentlemen, I don't take these cases very often, and I only take them when I think there is something there.'" *Id.* at 821 (citing trial transcript).

The *Stemmons* court acknowledged that the comment was improper, but held that "we do not believe that this one isolated remark during the closing statement affected the jury's verdict." *Id.* at 822 (citing *Sanders–El v. Wencewicz*, 987 F.2d 483, 485 (8th Cir.1993); *City of Malden, Mo. v. Union Elec. Co.*, 887 F.2d 157, 164 (8th Cir.1989)).

 Here, counsel's reference to Eichmann's and Murphy's conduct as "terrorist" acts must be viewed within the context of trial, the substantial evidence in support of the plaintiff's case, and counsel's lengthy closing argument. " 'A new trial should be granted where the improper conduct of counsel in closing argument causes prejudice to the opposing party and unfairly influences a jury's verdict.'" *Campos v. City of Blue Springs, Mo.*, 289 F.3d 546, 552 (8th Cir.2002) (quoting *Alholm v. American Steamship Co.*, 144 F.3d 1172, 1181 (8th Cir.1998), in turn quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir.1992)) (internal single quotations omitted). There is nothing in this record to suggest that counsel's statement prejudiced the jury. Accordingly, the court overrules John Morrell's motion for new trial.

### C. Plaintiff's Motion to Amend Complaint

Before turning to the parties' respective motions to amend judgment, the court will first consider Baker's Motion to Amend Complaint because disposition of this motion potentially impacts the remaining post-trial motions in this case.

In her Motion to Amend Complaint, brought pursuant to Federal Rule of Civil Procedure 15(b), Baker seeks to add sexual harassment and retaliation claims under state law to conform to the evidence presented at trial. Specifically, she moves to amend her complaint to add discrimination

claims under the Iowa Civil Rights Act ("ICRA"), Iowa Code ch. 216. The complaint originally filed with this court pleads only causes of action under Title VII. However, her original complaint states that she filed a charge of discrimination with the Iowa Civil Rights Commission ("ICRC"), that she received a right-to-sue letter from the ICRC, which was attached to her complaint, and that filing her charge with the ICRC was part of the basis of her retaliation claim.

The import of the amendment is clear—without any state-law claims to argue that her emotional distress damages award should be allocated to, Baker cannot escape the Title VII damages cap. *See* 42 U.S.C. § 1981a(b)(3). She argues that the court should grant her leave to amend because John Morrell was on notice of the state-law claims and because John Morrell would not be prejudiced in its defense of the claims because the standards of liability under the state-law claims mirror the federal standards. For obvious reasons, John Morrell resists the plaintiff's motion. It argues that the court should deny Baker's motion to amend her complaint because John Morrell did not have actual notice of her intent to inject state-law claims into her lawsuit. Moreover, John Morrell argues that the court should not grant leave to amend because of Baker's undue delay and neglect in moving to amend.

The liberal principles governing amendment under Rule 15 are well-established and easily stated. Once a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). Rule 15(b) provides in part that,

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings ... may be made upon motion of any party, at any time, even after judgment....

FED. R. CIV. P. 15(b). The purpose of the rule "is to bring the pleadings in line with the actual issues upon which the case was tried." *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir.1981) (citing *Gallon v. Lloyd–Thomas Co.*, 264 F.2d 821, 825 n. 3 (8th Cir.1959)). Noted scholars have summarized the purpose and substance of Rule 15(b) as follows:

> Although it always is preferable to move under Rule 15(a) to amend the pleadings before trial, there are instances in which the need to do so does not become apparent until so close to trial, or after the trial has actually commenced, that the request for a change can be made only when the trial is under way. Moreover, on occasion the course of the trial departs so materially from the image of the controversy pictured in the pleadings or by the discovery process that it becomes necessary to adjust the pleadings to reflect the case as it actually was litigated in the courtroom. Rule 15(b) is designed to serve that purpose.
>
> Subdivision (b) describes two procedures for what commonly are referred to as amendments to conform to the evidence. Technically, only the first of these really fits that description. It is set forth in the first sentence of Rule 15(b), which provides that when an issue not embraced by the pleadings is tried with the express or implied consent of the parties, it is to be treated in all respects as if it had been raised by the pleadings. The second procedure described in Rule 15(b) authorizes the court to permit the pleadings to be amended when evidence is objected to at trial as not being within the framework

of the pleadings. The rule provides that in this situation permission to amend must be freely given by the court if it appears that the presentation of the merits of the action will be subserved thereby and the opposing party will not be prejudiced in the maintenance of his action or defense.

. . . . .

Even though the two procedures described in Rule 15(b) are quite different in their operation and application, both are designed "to avoid the tyranny of formalism" that was a prominent characteristic of former practice and to avoid the necessity of a new trial, which often followed a deviation from the pleadings. As pointed out in an earlier section, at common law and to a lesser degree under the codes, the pleadings completely controlled the subsequent phases of the litigation. Evidence offered at trial that was at variance with allegations in the pleadings generally could not be admitted, or even if admitted would not be allowed to provide the basis for the final disposition of the action. Federal Rule 15(b) is designed to eliminate the harshness of this earlier practice. The two procedures provided for in the rule are intended to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action and later proves to be erroneous. Consequently, courts should interpret subdivision (b) liberally and permit an amendment whenever doing so will effectuate the underlying purpose of the rule.

. . . . .

An amendment will be allowed only if the parties have received actual notice of an unpleaded issue and have been given an adequate opportunity to cure any surprise that might result from the change in the pleadings. Before a newly raised issue can become part of the action, it must be tried with the consent of the parties, or if the evidence is challenged, the objecting party must be given an opportunity to demonstrate that the introduction of the evidence at trial is so prejudicial that the detrimental effect cannot be cured by a continuance or the imposition of some other condition on allowing the amendment. . . .

It is now generally accepted that there may be no subsequent challenge of issues actually litigated, if there has been actual notice and adequate opportunity to cure surprise. If it is clear that the parties understand exactly what the issues are when the proceedings are had, they cannot thereafter claim surprise or lack of due process because of alleged deficiencies in the language of particular pleadings. Actuality of notice there must be, but the actuality, not the technicality, must govern.

CHARLES ALAN *WRIGHT, ET AL.*, 6A FEDERAL PRACTICE & PROCEDURE CIVIL 2D § 1491 (1990) (footnotes omitted).

The decision to allow or disallow an amendment is a discretionary matter for the district court to resolve. *E.g., Corsica Livestock Sales, Inc. v. Sumitomo Bank of Cal.*, 726 F.2d 374, 377 (8th Cir. 1983) ("[T]he trial court will only be reversed on appeal if it abused its discretion in granting or refusing an amendment to the pleadings.") (citing *Gallon*, 264 F.2d at 823). Further, the district court's resolution of a Rule 15(b) motion " 'will not be reversed except upon a showing of abuse.' " *Brown v. Cooper Clinic, P.A.*, 734 F.2d 1298, 1301 (8th Cir.1984) (per curiam) (quoting *Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 276 (8th Cir.1978)).

It appears to the court that the plaintiff's Rule 15(b) motion is a square peg that does not fit into the round holes contemplated by the rulemakers. As noted

above, the rule is designed to avoid the necessity of a new trial when the need to amend the pleadings does not become apparent until trial has commenced. WRIGHT, ET AL., *supra*, at § 1491. In this case, nothing arose during trial that would have alerted the plaintiff of the need to amend her complaint to plead state-law claims. Instead, it is obvious that the substantial verdict and the damages cap prompted the plaintiff's motion, and the court doubts that Rule 15(b) was designed to address this type of situation. Nevertheless, the court assumes without deciding that Rule 15(b) authorizes the court to grant the plaintiff's motion in this case if otherwise appropriate.

Here, there is no question that the parties did not expressly consent to try Baker's state-law claims. Therefore, disposition of this motion depends, in part, upon whether the parties impliedly consented. In *Gallon v. Lloyd–Thomas Co.*, 264 F.2d 821, 825 n. 3 (8th Cir.1959), the Eighth Circuit explained the relevant standards for a Rule 15(b) amendment after judgment:

> "The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore, an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, even though there is evidence in the record introduced as relevant to some other issue which would support the amendment."

*Id.* (quoting 3 MOORE'S FEDERAL PRACTICE § 15.13, at 846–47) (citations omitted).

Given John Morrell's record of contesting every issue in this case, it is

difficult to believe that they impliedly consented to anything Baker may have raised at trial. Furthermore, in the Eighth Circuit, " 'it cannot be fairly said that [parties] implied[ly] consent to try an [unpleaded] issue [unless they] squarely recognize it as an issue in the trial.' " *Standard Title Ins. Co. v. Roberts*, 349 F.2d 613, 620–21 (8th Cir.1965) (citations omitted). Implied consent cannot be inferred from the unchallenged introduction of evidence relevant to an unpleaded issue when the evidence is also relevant to an issue already in the case. *Brown*, 734 F.2d at 1301. " '[A]n amendment after judgment is not permissible which ... *changes the theory on which the case was actually tried*, even though there is some evidence in the record introduced as relevant to some other issues which would support the amendment.' " *Id.* (omission provided by *Brown* court) (emphasis added) (quoting *Dependahl*, 653 F.2d at 1218).

The court agrees that John Morrell would not be prejudiced by amendment because liability standards in this case under Title VII and the ICRA would be identical.[16] However, prejudice is only one-half of the equation. In order to permit Baker to amend her complaint under Rule 15(b), the court must also conclude that John Morrell impliedly consented to try unpleaded state law claims. Baker contends that two brief references to the filing of a discrimination charge with the ICRC in her original complaint, coupled with the fact that part of the basis of her retaliation claim was the fact of that filing, put John Morrell sufficiently on notice of her intent to invoke state law and to try a case that could result in a verdict in excess of the Title VII damages cap.[17]

---

**16.** The court recognizes that prejudice could result from a defendant's failure to settle at an amount above the damages cap if the defendant feared a large verdict under parallel state-law claims. However, the defense has not argued this type of prejudice here.

**17.** Prior to trial, the defendant erroneously believed that the Title VII damages cap did

The court disagrees. Even if the plaintiff pursued both state and federal law remedies at the administrative level, by filing a complaint under Title VII alone, John Morrell reasonably could have concluded that she made a choice to invoke federal law and to forego her state law claims when she ultimately filed suit. Baker's actions *before* filing suit are alone insufficient to place John Morrell on notice of her intent at trial to inject state law claims into her lawsuit.

The parties center their attention on *Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir.1997). In *Nash Finch*, the Title VII race discrimination plaintiff prevailed at trial and moved under Rule 15(b) to amend his complaint to add a cause of action under 42 U.S.C. § 1981. Like Baker's ICRA claims, Kim's theory of recovery under § 1981 was critical to his ability to recover the full amount of damages awarded by the jury because, unlike his Title VII claims, the statutory cap did not apply to § 1981 claims. *Id.* at 1062. The district court denied the amendment, but the Eighth Circuit reversed, finding that the issue of § 1981 liability had been tried by implied consent because the defendant was not prejudiced and had notice of the plaintiff's intent to inject the unpleaded issues. *Id.* at 1063–64.

The notice to the defendant in *Nash Finch* was substantial. First, several portions of the plaintiff's complaint specifically alleged—or incorporated by reference—violations of § 1981. *Id.* The court held that the allegations in Kim's complaint alone were sufficient to put the defendant on notice of the plaintiff's claim that Nash Finch's conduct violated both Title VII and § 1981. *Id.* at 1064. Second, the plaintiff moved several times to amend the pleadings—in pre-trial proceedings, immediately before trial, and during trial. *Id.* Third, the district court found, but later reconsidered, that the case had been tried on the basis of both § 1981 and Title VII. *Id.*

The *Nash Finch* court held that the admission of certain evidence " 'cannot form the basis for an amendment under Rule 15(b) unless the *defendant knew* of the *plaintiff's intent* to inject the unpleaded issues.' " *Id.* at 1063 (emphasis added) (quoting *McLaurin v. Prater*, 30 F.3d 982, 986 (8th Cir.1994)). Thus, the defendant must be aware that it is trying an unpleaded issue *and* the plaintiff must have intended to try the unpleaded issue. *See id.; accord Pariser v. Christian Health Care Sys., Inc.*, 816 F.2d 1248, 1253 (8th Cir. 1987) (affirming district court's denial of plaintiff's post-trial Rule 15(b) motion where there was "nothing in the transcript

---

not apply to punitive damages. [Motions *in Limine* Tr. at 13]. However, this misconception was not based on any belief John Morrell held regarding whether Baker had brought a state-law claim. Indeed, the ICRA does not provide for the recovery of punitive damages at all. *E.g., Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 382–84 (Iowa 1986). Defendant's counsel's misconception was based wholly on its flawed reading of 42 U.S.C. § 1981a.

Moreover, misreading of the statute aside, the transcript on the defendant's motions *in limine* (Doc. No. 147) reveals that the defendant was cognizant of the damages cap and believed that Baker's damages were subject to it. Curiously, the plaintiff relied on *Madison*

*v. IBP, Inc.*, 257 F.3d 780, 793–94 (8th Cir. 2001), *vacated and remanded on different grounds*, 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002), in support of her resistance to the defendant's motion to exclude the testimony of Canady and Windle. In *Madison*, the Eighth Circuit affirmed the district court's allocation of damages in a Title VII and ICRA sex discrimination case where the allocation was specifically sought in order to avoid the Title VII damages limitation provision. *Id.* at 801. If the plaintiff intended to assert sex discrimination claims under the ICRA, the court cannot fathom why the plaintiff did not move to amend or even correct the defendant's belief that it was trying a case subject to the damages cap at this time.

to indicate that Pariser intended to try a tortious-interference claim or that the defendant in any way consented to trial of such a claim"); *cf. Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F.3d 1244, 1256 (8th Cir.1994) (holding district court abused discretion in denying 15(b) motion where plaintiff gave defendant clear notice of intent to try unpleaded punitive damages claim).

Here, the court finds not only that John Morrell did not have notice of Baker's intent to try her state-law claims, the court finds that the plaintiff herself did not intend to try them. There is not a scintilla of evidence on this record that Baker intended to assert any discrimination claims under the ICRA. Instead, after the jury returned a large verdict, she moved to amend in order to circumvent the Title VII damages cap. Indeed, plaintiff's counsel in his closing argument confined his case to Title VII and stated,

> I was trying to remember when it was that the 1964 Civil Rights Act was passed because that's what you're here enforcing. . . . It was Buzz Aldrin and Neil Armstrong walked on the moon in '69. The Vietnam War was just starting to reach its—just starting to reach

its peak in '64. We were just going through some of the worst of Vietnam, and it was building up to get worse. That's how long ago—I don't know where you were in '64 if you can remember. But back in '64 is when this legislation was passed.

> And we are here today dealing with the residual group—part of our society that has not conformed to that law yet and refuses to conform to that law. They have had twenty—what is that?— 28 years, 27 years now to conform to this law and have not done it yet. . . .

[Tr. at 1552–53].

 Moreover, the plaintiff's trial brief (Doc. No. 80) states that her causes of action are brought under Title VII, 42 U.S.C. § 2000e *et seq.* Also, the plaintiff identified her issues for trial in the final pre-trial order (Doc. No. 86) as "Whether Plaintiff suffered sexual harassment actionable under Title VII of the Civil Rights Act of 1964," and "Whether Plaintiff suffered retaliation actionable under Title VII." In addition, this court, in its ruling on the defendant's motion for summary judgment, noted that Baker had only raised claims under Title VII.[18] Plaintiff

---

18. A major issue in the motion for summary judgment in this case was the limitations period on Baker's disparate treatment claim and whether Baker could offer evidence of disparate treatment predating the limitations period. Under Title VII, to be deemed timely, an EEOC charge must be filed "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); *Kimzey,* 107 F.3d at 572. Once a timely administrative charge has been filed, a prevailing Title VII plaintiff can recover only for timely discriminatory conduct. *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2068, 153 L.Ed.2d 106 (2002).

The Iowa Civil Rights Act, however, does not impose such a limited recovery period on sexual harassment claims. *See Channon v. United Parcel Service, Inc.,* 629 N.W.2d 835

(Iowa 2001). An ICRA sexual harassment claimant must file suit within 180 days of the alleged discriminatory act, IOWA CODE § 216.15(12), but the plaintiff is entitled to an award of damages for the entire period that the plaintiff's rights were violated. *Madison,* 257 F.3d at 799 (citing *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512 (Iowa 1990)).

The plaintiff never raised this argument on summary judgment. Instead, Baker sought to admit evidence of events predating the Title VII limitations period not as a basis for an award of damages but as relevant evidence to aid the trier of fact in determining whether or not the acts within the 300–day period were discriminatory.

While the court recognizes that the evidence was introduced on Baker's disparate treatment claim, it would also have been rele-

had ample opportunity to amend her complaint.

Had the plaintiff intended to assert state-law claims and had only inadvertently neglected to plead them, it is reasonable to conclude that she would have moved to amend her complaint prior to trial. She did not. Furthermore, she had ample opportunity to amend, or at least to voice her intent to try her case under the ICRA as well as under Title VII. For example, prior to the commencement of trial, counsel met with the court to discuss any unresolved issues, and the plaintiff did not mention the ICRA at that time. Moreover, the court held multiple jury instruction conferences, both on and off the record, and at no time did the plaintiff seek to clarify that she intended to bring her claims under the ICRA and Title VII.

Instead, it was only after the jury returned a verdict well in excess of the Title VII statutory damages cap that the issue of parallel state-law claims arose when the plaintiff moved to amend. The court concludes that she did not intend to try state-law claims. Therefore, there could not be any proof to conform to within the meaning of Rule 15(b) because the plaintiff did not intend to inject any unpleaded claims at trial.

Because the court finds that John Morrell was not on notice of Baker's attempt to try a case that could result in a verdict in excess of the damages cap and because the court finds that Baker did not intend to try any such claims until the jury returned a 1.52 million dollar verdict in her favor, the court denies the plaintiff's motion to amend complaint.[19]

### D. Defendant's Motion to Amend the Judgment

As part of the plethora of post-trial motions in this case, John Morrell moved to amend the judgment. It argues (1) that the statutory damages cap applies; (2) the jury's award for compensatory damages is excessive and not supported by the evidence; and (3) that punitive damages were not recoverable because they were unsupported by the evidence. The jury awarded Baker a total of $1.52 million in damages, allocated as follows:

- On her sexual harassment claim $250,000.00 for past emotional distress and $50,000.00 for future emotional distress;
- On her retaliation claim, $75,000.00 for past emotional distress and $10,000.00 for future emotional distress;
- On her constructive discharge claim, $150,000.00 for past emotional distress and $200,000.00 for future emotional distress;
- For the medical expenses on her sexual harassment claim, $14,470.24 for past medical expenses and $90,000.00 for future medical expenses;
- In backpay, $33,314.73;
- For punitive damages on her sexual harassment claim, $600,000.00; and
- For punitive damages on her retaliation claim, $50,000.00.

vant to her hostile work environment claim. The court is at a loss to find a principled reason why the plaintiff would not have raised this critical distinction between federal and state law regarding recoverable time periods had the plaintiff intended to bring a claim under the ICRA.

**19.** Under these circumstances in which the court finds that the plaintiff moved to amend in order to avoid the Title VII damages cap

but did not intend to bring the state-law claims until the large verdict was returned, the court opines that Rule 15(b) does not impart the court with authority to grant the plaintiff's amendment. However, because the standards for liability in this case are identical under the ICRA and Title VII and, therefore, amendment would not result in any prejudice to the defendant, the court would grant the plaintiff's motion if the court had discretion to do so.

### 1. Application of the statutory damages cap

After finding that additional federal remedies were needed to deter unlawful harassment and discrimination, Congress amended 42 U.S.C. § 1981 in 1991 "to provide appropriate remedies for intentional discrimination and unlawful harassment in the workplace." *Civil Rights Act of 1991*, Pub.L. No. 102–166, § 3. Prior to passage of the Civil Rights Act of 1991, a prevailing Title VII plaintiff was entitled to the relief enumerated in section 706(g) of the Equal Employment Opportunity Act of 1972. A court could enjoin the employer from engaging in illegal discrimination and order affirmative relief, "which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1). It is widely recognized that Congress enacted the 1991 Civil Rights Act, in part, because the damages available to successful civil rights plaintiffs were an insufficient deterrent to employers and did not function as an adequate compensatory mechanism. The statutory damages cap provision, 42 U.S.C. § 1981a(b)(3), represents a compromise, which one commentator has explained as follows:

> As a practical matter, financial awards under Title VII were almost exclusively in the form of front pay and back pay. These actual damages might be rather small and could be further limited by the plaintiff's duty to mitigate her damages. This meant that plaintiffs often had little or no financial incentive to pursue their claims (assuming they could find attorneys willing to represent them). For victims of sexual harassment, a form of discrimination, there was even less reason, at least monetarily, to bring suit. A victim who could prove she was subject to a hostile working environment, but who had suffered no corresponding financial loss such as termination or demotion, was entitled to no damages award at all. As Representative Hawkins noted during the debate on the 1991 Act, "There is little incentive for a plaintiff to bring a [T]itle VII suit when the best that she can hope for is an order to her supervisor and to her employer to treat her with the dignity she deserves and the costs of bringing her suit."
>
> The bill that passed Congress in November 1991 was a compromise. Representative Hughes told his colleagues that the bill was "not a perfect bill by any means, but its flaws are significantly outweighed by its virtues." One of the flaws of the bill, in Representative Hughes's opinion, was the cap it set on compensatory and punitive damages. Some legislators were dismayed by the bill's expansion of tort remedies for employment discrimination, especially because the new remedies were accompanied by the right to a jury trial, previously unavailable in such cases. The compromise was to allow compensatory and punitive damages when the plaintiff was able to prove intentional discrimination, but to limit those damages according to the employer's size.

Rhonda Wilcox, Comment, *Doing an End Run Around Damage Caps: Pollard v. E.I. DuPont deNemours and Unlimited Front Pay*, 53 MERCER L. REV. 867, 868–70 (2002) (footnotes omitted).

Pertinent to Baker's case, "the sum of the amount of compensatory damages awarded under [Title VII] for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed ... $300,000." 42 U.S.C. § 1981a(b)(3)(D). Thus, congressional

mandate requires the court to remit Baker's compensatory and punitive damages award to $300,000. This amount is exclusive of backpay and attorney's fees. *See* 42 U.S.C. § 1981a.

### 2. Sufficiency of the evidence to support compensatory damages award

The Eighth Circuit Court of Appeals has held that any award for emotional distress must be supported by competent evidence of a "genuine injury." *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir.1999) (citing *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). Emotional distress damages include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury. *Carey*, 435 U.S. at 264 n. 20, 98 S.Ct. 1042 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). While a compensatory damage award may be based solely on plaintiff's own testimony, such testimony should identify and describe the kind of severe emotional distress that would warrant such an award of emotional distress damages. *Forshee*, 178 F.3d at 531 (citing *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 357–58 (8th Cir.1997)). Also, it is well-settled that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms. *See, e.g., Jenkins v. Mc-*

*Lean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir.1988); *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1299 n. 3 (8th Cir.1987); *Stafford v. Neurological Medicine, Inc.*, 811 F.2d 470, 475 (8th Cir.1987); *Vanskike v. Union Pac. R. R.*, 725 F.2d 1146, 1150 (8th Cir.1984).

John Morrell argues that the jury's award for Baker's emotional distress is not supported by specific facts establishing a genuine injury, nor, according to the defendant, can she show a causal connection between her actual harm and the harassment.[20] The court strongly disagrees. In order to reach its conclusion that Baker cannot show a genuine issue, John Morrell again urges the court to disregard evidence that favors the plaintiff. Baker presented extensive evidence of genuine injury caused by the harassment not only through her own testimony, but through the testimony of her treating physician, her psychologist, her brother, and friends and coworkers. She testified, and her doctors corroborated, that she suffered from post-traumatic stress syndrome and severe depression caused by the harassment she suffered at John Morrell. Her brother and her friends testified that she was a "different person" than she used to be; while she used to be outgoing, she became withdrawn and isolated. She suffered from a mental breakdown, anxiety attacks, and even attempted suicide. Because of her mental condition, she was prescribed medication, lost weight, and had difficulty sleeping. John Morrell thoroughly cross-examined Baker's physicians and Baker with respect to the causation of these damages, but the jury evidently chose to place credence in the plaintiff's

20. For the first time in its reply brief, John Morrell attacks separately the amounts of past and future emotional distress. However, a party cannot properly assert a new argument in a reply brief. N.D.IA.L.R. 7.1(g). Nothing in Baker's resistance would have prompted such an argument in reply. Therefore, the court will not distinguish between amounts awarded for past and future emotional distress but will, like the parties' properly-raised arguments, consider past and future emotional distress damages only in the aggregate.

evidence, which established that her condition was a result of the discrimination.

Baker was subjected to egregious, unremedied harassment. She produced an abundance of evidence that she was subjected to a pervasively hostile work environment at John Morrell and was discriminated against because of her sex. She also showed that she was retaliated against for complaining to management and for filing an administrative complaint. As a result of these illegal acts, she was constructively discharged and suffered emotional distress. This is not the type of case where the plaintiff suffered from "vague and ill-defined" emotional and social problems. *See Delph,* 130 F.3d at 357–58. If this were such a case, the court agrees that an award of $735,000, as awarded by the jury, would be excessive. However, Baker's case is more in line with cases in which substantial emotional distress damages have been upheld because of the undisputed, abundant, and corroborated evidence of depression, post-traumatic stress syndrome, anxiety, weight loss, and personality change resulting from the harassment, her constructive discharge, and John Morrell's retaliation and indifference toward her complaints. *See, e.g., O'Rourke v. City of Providence,* 235 F.3d 713, 734 (1st Cir. 2001) (emotional distress award of $275,000 was not excessive where plaintiff suffered from severe post-traumatic stress disorder resulting from harassment); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 503, 513–14 (9th Cir.2000) (affirming $1 million emotional distress award for sexual harassment where plaintiff "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counsel-

ing with her pastor); *Madison,* 257 F.3d at 802–802 (affirming $266,750 jury award for emotional distress and holding award was not excessive in light of the "voluminous evidence" that the plaintiff suffered emotional distress damages); *Lilley v. BTM Corp.,* 958 F.2d 746, 754 (6th Cir.1992) (upholding a verdict of $350,000 for emotional distress damages flowing from the employer-defendant's violation of the Elliott–Larsen Civil Rights Act); *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir.1986) (affirming $400,000 jury award for emotional distress where "[the plaintiff's] testimony as well as that of other witnesses tended to show a deterioration in his health, mental anxiety, humiliation, and emotional distress resulting from the conditions under which he worked ... and from the discharge"); *Wilson v. General Motors Corp.,* 183 Mich.App. 21, 454 N.W.2d 405, 415 (1990) (even though the plaintiff presented no "expert testimony regarding her mental distress but only testimony as to her own subjective feelings," the appellate court allowed the $375,000 award—remitted by the trial court from $750,000—of non-economic damages to stand).

After thoroughly reviewing the lengthy record, the court finds that the jury's award of $735,000 in emotional distress damages was not grossly excessive. However, in light of the statutory damages cap, the court must remit the award to $300,000 for Baker's emotional distress damages. This award, in light of prior cases and Baker's evidence, surely is not grossly excessive given the years of severe and pervasive, unremedied harassment, discrimination, and retaliation that Baker endured.[21] Therefore, the court grants in

---

**21.** "Punitive damages are allowed under Title VII if the defendant discriminated 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Beard v. Flying J, Inc.,* 266 F.3d 792, 800 (8th Cir.2001) (citing 42 U.S.C. § 1981(a)(1), (b)(1)); *accord Madison,* 257 F.3d at 794; *see generally Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118,

part and denies in part John Morrell's motion to amend the judgment.

### 3. Summary of damages

Although the court concludes that the jury's damage awards were supported by the evidence, it must nonetheless reduce the judgment entered in plaintiff's favor to comply with the statutory cap on damages, 42 U.S.C. § 1981(b)(3)(D). Accordingly, the court remits the compensatory damages award to $300,000, which the court also finds is supported by the evidence and is not clearly excessive.

Moreover, the defendant did not challenge the plaintiff's award of $33,314.73 in backpay. Backpay does not fall within the statutory damage cap; therefore, the plaintiff is entitled to its recovery even though it results in an award in excess of the cap. See 42 U.S.C. § 1981a(b)(2) (excluding backpay and "any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–5(g) ]" from application of the damages cap provision). Accordingly, the damages the plaintiff shall recover on her Title VII sex discrimination case amount to $333,314.73, plus post-judgment interest as provided by federal law, 28 U.S.C. § 1961.

### III. CONCLUSION

The court has thoroughly considered the evidence presented at trial, as well as each of the arguments made by the parties. After applying the pertinent standards, the court finds as follows: the plaintiff presented sufficient evidence to support her sexual harassment, retaliation, and constructive discharge claims; none of the evidentiary rulings the defendant challenges was erroneous, nor was any so prejudicial that a new trial would likely produce a different result; the plaintiff's treating physician's testimony was admissible as expert testimony; plaintiff s counsel's reference to terrorism in his closing arguments was arguably imprudent but was not plainly injurious or prejudicial; the defendant waived its objection to the jury instructions, which, in any event, were proper. Therefore, the court **denies** the defendant's **Motion for Judgment as a Matter of Law** and **Motion for New Trial.**

However, the court finds that plaintiff did not intend to bring her lawsuit under the Iowa Civil Rights Act and, therefore, the defendant could not have been on notice of any intent to try a lawsuit that could result in a verdict in excess of the Title VII damages cap. Accordingly, the court **denies** the plaintiff's **Motion to Amend Complaint,** even though the defendant would not be prejudiced in its defense of Baker's claims against it.

Because the damages cap applies, the court must **remit** the plaintiff's damages to $300,000, exclusive of backpay. The court finds that this figure is appropriate and supported by the plaintiff's evidence of the emotional distress she suffered because of the defendant's intentional discrimination

---

144 L.Ed.2d 494 (1999) (outlining parameters of punitive damage analysis under Title VII). "[E]gregious" conduct by an employer is not necessary to impose punitive damages. *Kolstad,* 527 U.S. at 534, 119 S.Ct. 2118. Instead, an employer may be liable for punitive damages in any case where it "discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Id.* at 536, 119 S.Ct. 2118.

The court is confident that John Morrell's conduct supports the jury's conclusion that an award of punitive damages of at least $300,-000—the statutory cap—is warranted, based on much of the same reasoning employed with respect to Baker's constructive discharge claim and John Morrell's indifference to her complaints. However, because Baker's emotional distress damages alone reach the statutory damages cap, the court will not address the punitive damages award further.

in this case. Moreover, the defendant did not challenge the plaintiff's award of back-pay, and the jury's award of $33,314.73 will stand. Therefore, the plaintiff **shall recover $333,314.73, plus post-judgment interest as provided by federal law.** Accordingly, the defendant's Motion to Amend Judgment is **granted in part and denied in part.**

Finally, the **time for appeal of this order is stayed,** pending disposition of the plaintiff's Motion to Alter or Amend Judgment, which she seeks an award of front pay, (Doc. No. 118), and Motion for Attorney's Fees, Costs, and Expenses (Doc. No. 122). Pursuant to Federal Rule of Civil Procedure 58(c)(2) and Federal Rule of Appellate Procedure 4(A), **judgment shall not enter** and the **time for appeal shall not begin to run until the court files the supplemental order disposing of these remaining post-trial motions.**

**IT IS SO ORDERED.**